Filed 2/11/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re ART T., <br><br> a Person Coming Under the Juvenile Court Law. | B251083 <br><br> (Los Angeles County Super. Ct. No. FJ50686) |
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> ART T., <br><br>     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Benjamin J. Campos, Juvenile Court Referee. Reversed with directions.

Center for Juvenile Law and Policy, Christopher Hawthorne and Patricia Soung for Defendant and Appellant.

Bluhm Legal Clinic, Joshua A. Tepfer, Steven A. Drizin, Laura H. Nirider; Law Offices of Cyn Yamashiro and Cyn Yamashiro for Center on Wrongful Convictions of Youth as Amicus Curiae on behalf of Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, William H. Shin and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

_____

**INTRODUCTION**

In this juvenile delinquency proceeding, we hold that a 13-year-old boy's statement—"Could I have an attorney? Because that's not me"—made during the course of a custodial interrogation after watching a video of a shooting was an unequivocal and unambiguous invocation of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (*Miranda*) and its progeny. In reaching this conclusion, we apply a standard of whether a reasonable officer in light of the circumstances known to the officer or that would have been objectively apparent to a reasonable officer, including the juvenile's age, would understand the statement by the juvenile to be a request for an attorney. We conclude that a reasonable officer would have understood the juvenile's statement in this case to be a request for an attorney.

The juvenile court should have granted the motion to suppress the statements subsequently elicited by police. Because the *Miranda* error was not harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] (*Chapman*), we reverse and remand for further proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.** *The Shooting*

On August 18, 2012, at about 12:40 a.m., there was a shooting on the 1400 block of Alvarado Terrace in Los Angeles. Alex Castaneda, Saul Barragan and Leonardo Villanueva were shot. Castaneda died; Barragan and Villanueva survived. Two surveillance cameras recorded the shooting.

**B.** *Defendant Art T.'s Interrogation*

As part of their investigation into the shooting, the police directed their attention to defendant Art T. (Art), who was then 13 years old. On August 20, 2012, police brought Art to the police station where Los Angeles Police Detectives Julian Pere, Jeff Cortina and Michael Arteaga interrogated him.[1] Art's interrogation was videotaped and subsequently transcribed. At the outset of the interrogation, Detective Pere conducted a *Gladys R.* inquiry for the purpose of determining whether Art knew right from wrong.[2]

It was not until page 21 of the transcript of the interrogation[3] that Detective Cortina advised Art of his *Miranda* rights:

"DETECTIVE CORTINA: All right, Art, I'm going to ask you some questions and if you don't understand let me know and I will explain them, okay?

"[ART]: Okay.

"DETECTIVE CORTINA: You have the right to remain silent. Do you understand?

"[ART]: Yes.

---

[1] It is not disputed that Art was in custody at the time of the interrogation.

[2] In *In re Gladys R.* (1970) 1 Cal.3d 855, our Supreme Court concluded "that the juvenile court should consider whether a child appreciates the wrongfulness of her conduct in determining whether the child should be declared a ward under [Welfare and Institutions Code] section 602." (*Id*. at p. 858, fn. omitted; see Pen. Code, § 26 [children under the age of 14 are incapable of committing a crime "in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness"].)

[3] Because the juvenile court only had a transcript of the interrogation before it when it ruled on Art's motion to suppress, we limit our review to the transcript. At oral argument, Art's counsel argued that the parties had stipulated to allow the juvenile court to watch the videotape outside of the courtroom. According to the record, however, this stipulation was only reached with respect to the adjudicatory hearing, after the juvenile court had ruled on the motion to suppress. Throughout the hearing on the motion to suppress, the juvenile court consistently referred to its consideration of a "cold transcript." At no time during the hearing did the juvenile court reference the videotape of the confession.

"DETECTIVE CORTINA:  Anything you say may be used against you in court. Do you understand?

"[ART]:  Yes.

"DETECTIVE CORTINA:  You have the right to the presence of an attorney before and during any questioning.  Do you understand?

"[ART]:  Yes.

"DETECTIVE CORTINA:  And if you cannot afford an attorney one will be appointed for you free of charge before any questioning if you want.  Do you understand?

"[ART]:  Yes, sir."

Detective Cortina made no attempt to secure an express waiver of rights from Art. After giving the *Miranda* warnings, he continued to talk to Art and to question him about the shooting.  He informed Art that his partner was going to show him something. Detective Cortina said, "[w]e've talked to a lot of people and there's a lot we know.  And so all we're looking for is just the truth."

After talking to Art about "survival of the fittest," including turning on someone to save yourself, Detective Pere told Art that his "day just went from bad to worse because the reason that we're actually speaking to you is because" someone "did you the same way."  The detective then showed Art the video taken of the shooting and said, "That, my friend, would be you."  Art denied that was him in the video and stated, "I've never killed nobody before."  After Art also denied any familiarity with the location, Detective Pere said, "Oh, okay.  Well, I'm here to tell you, man, that's the video of you being captured on the 18th after midnight."  Art said he was at home at midnight and told the detective to ask his mother.

Art continued to deny any complicity in the shootings.  He said the clothes the person in the video was wearing were not his.  He denied being on Alvarado Terrace and said he was with a friend in Arcadia.  He denied even knowing where Alvarado Terrace was.  At this juncture, starting on page 30 of the transcript, the following transpired:

"DETECTIVE PERE:  Huh-uh.  You weren't in Arcadia.  You were right there on Alvarado Terrace blasting on people.

4

"[ART]: That's not me. I don't know how else to tell you. That's not me.

"DETECTIVE PERE: Okay. Well, I — you know what? We're here to speak to you to get your statement. Now, if your statement is that that's not you, don't worry. We're going to write it down just the way you said. That's not —

"[ART]: Could I have an attorney? Because that's not me."

"DETECTIVE PERE: But — okay. No, don't worry. You'll have the opportunity."

Despite Art's request for an attorney, the interrogation continued with Detective Arteaga taking the lead. Detective Arteaga repeatedly encouraged Art to tell the truth so that he would not appear to be a "cold blooded killer." He told Art that his mother was crying and had identified him in the video, when in fact she had not. When Art continued to deny his involvement in the shooting, Detective Arteaga said, "I'm about to leave. I'm trying to give you an opportunity to tell us the truth because right now it looks like you're a cold blooded gang murderer. That is serious."

In the 32 pages of transcript memorializing the interrogation between the time Art asked for an attorney and the time he confessed, Art continued to deny any involvement in the shooting. He also made multiple requests to speak with his mother and his girlfriend, but these requests were denied. On page 35 of the transcript, Art stated, "I'd like to talk to my mom." Then, on page 44 he pleads, "Could I just talk to my mom, please." On page 50, Art states, "Look, I just [want] to call my homeys, call my girl, get this shit over with. Let me do what I got to do. That's all. Got nothing else to say." On the next page he adds: "I'm not answering anything, dude, because everything I tell you guys is a lie to you guys." On page 52 he again asks to speak with his mother: "Well, if you guy[s] think I killed him go for it. Think what you got to think but I just want to make my phone calls. That's it. That's the most important thing right now is to talk to my mom too."

## C. *Art's Confession*

Over the next 10 pages of the transcript, Art continues to deny his involvement in the shooting. The detectives do not allow him to talk to his mother or to make a phone call. Art makes his first incriminating statement on page 63 of the transcript:

"DETECTIVE ARTEAGA: . . . But I'm telling you this, [the judge is] going to look at you a lot more — with a lot more compassion if you told the truth what happened. You didn't mean to kill him, did you? I mean, if you meant to go kill him because you were down for the hood, is that — is that what you wanted?

"[ART]: No.

"DETECTIVE ARTEAGA: You didn't want that, right?

"[ART]: No.

"DETECTIVE ARTEAGA: What did you think was going to happen?

"[ART]: I don't know. It just happened so fast."

Art denied being drunk or on drugs but stated, "[j]ust feeling the power. You feel . . . like the shit when you have a gun in your fucking hand." Art admitted that he shot at the group of individuals because he thought they were from the 18th Street gang. Art denied shooting in retaliation for the death of his "homey" two months earlier. Art admitted that "the thing that happened on Alvarado Terrace, that's like the only one I've been involved in."

Further questioning revealed Art and a second shooter each had a gun, but Art did not know the type of guns they used. Art admitted that they shot at the men because they thought they were from "Faketeen," a derogatory reference to the 18th Street gang.

## D. *The Welfare and Institutions Code Section 602 Petition*

On August 22, 2012, the People filed a Welfare and Institutions Code section 602 petition alleging that Art committed one count of murder (Pen. Code, § 187, subd. (a)) and two counts of attempted willful, deliberate, and premeditated murder (*id.*, §§ 187, subd. (a), 664). The People further alleged as to each count that Art personally and intentionally discharged a firearm, causing great bodily injury or death (*id.*, § 12022.53,

subds. (c) & (d)) and committed the crime for the benefit of, at the direction of, or in association with a criminal street gang (*id.*, § 186.22, subd. (b)(4)).

## E. *Art's Motion To Suppress*

In the juvenile court, Art filed a motion to suppress all statements that were obtained in violation of his *Miranda* and due process rights. Art argued that his confession resulted from the detectives' badgering and lies and thus was involuntary in violation of his due process rights. Art further argued that his *Miranda* rights were violated when the detectives failed to provide him with an attorney after he asked for one during the course of the interrogation.[4]

Neither party presented any testimonial evidence at the hearing on Art's motion to suppress. As we have noted, although the police videotaped Art's interrogation, the juvenile court only had the written transcript before it in ruling on Art's motion. When the juvenile court asked Art's trial counsel to "frame the issues," counsel argued that Art's statement, "Could I have an attorney? Because that's not me," invoked his right to counsel and that the detectives improperly continued to question him.

The juvenile court stated: "I'm reading a cold transcript. . . . So the court has to use the objective standard, and so, to me, some of the things that are not issues: clearly, he's in custody. Clearly, he's the focus of the investigation, and, in the court's mind, based on the transcript, clearly he's been advised of his *Miranda* rights. Clearly, he meets the *Gladys R.* threshold. So the issue then is, one, as to whether you have any evidence — whether you're going to put on evidence. Were you going to call the minor?

---

[4] Art also sought to exclude statements he made during telephone calls the police allowed him to make after the interrogation ended, including a telephone call to his girlfriend. There is no indication in the record, however, that Art provided the juvenile court with the recording of his telephone conversations or a transcript of the recording in connection with his motion to suppress. While the recording and transcript were admitted into evidence during the subsequent adjudication hearing, neither party has transmitted those exhibits to this court.

I'm not sure. That's why I was probing in that fashion. Again, not to — if you think it's just a matter of a legal issue and you want me to listen to your arguments and make a ruling based thereon, I'm certainly prepared to do that."

Art's counsel stated that she did not intend to call Art to testify and that she was seeking "a legal ruling." The prosecutor argued that Art's statement, "Could I have an attorney? Because that's not me," was a conditional rather than an unequivocal invocation of his *Miranda* rights, and thus the officers did not have to stop their questioning.

Art's counsel urged the juvenile court to consider Art's youth in assessing whether he invoked his right to an attorney. The court appeared to acknowledge that Art's developmental level was significant, stating: "That's what I was trying to get to, counsel. And, forgive me, but I cannot assume facts not in evidence. I cannot imagine myself in the situation. The court has to have a picture — a word picture — painted for it. I know some 13 year olds that are quite sophisticated, quite able to manipulate the system. In fact, they manipulate me every day. Anyone who thinks somebody who is 12 or 13 can't do that is just fooling themselves. On the other hand, we have some kids in here who are quite naïve at 15 and 16, and there's a developmental phase to children. . . . Clearly, there is sleight of hand and some deception going on, but none of my research indicates that that, by itself, constitutes a violation of the law. . . . What basically I have is a statement in passing. Well, if that's not me — 'That's not me. I want a lawyer,' whether that constitutes a revocation of his waiver to speak to the police. I mean, if you want a tentative based on what I have now, I just don't think that's sufficient."

Art's counsel then argued that Art's confession was coerced. The court stated, "But I think, again, based on my reading of the entire transcript, my review of the law, I think there is insufficient factual basis for the court to grant your motion, and, therefore, your motion is respectfully denied." The court did not address Art's motion to suppress the statements he made to his girlfriend given its denial of the motion to suppress his confession to police.

8

**F. *The Adjudication Hearing***

Art's adjudication hearing was held on May 7, 9 and 10, 2013.

1. *The People's Case*

The prosecution called three eyewitnesses to the shooting, including Saul Barragan, Leonardo Villanueva, and Ricky Mora, who were part of a group of seven or eight people gathered outside on August 18, 2012, when the shooting occurred. At around 12:40 a.m., Barragan, Villanueva, Mora, Alex Castaneda, and others in the group were on the 1400 block of Alvarado Terrace in Los Angeles when gunshots rang out. Castaneda was shot, and died from a gunshot wound to his torso. Barragan and Villanueva were also shot, but survived gunshot wounds to their legs. Mora was not injured.

Mora saw "sparks" in two different locations and therefore believed there were two shooters. One shooter was on the sidewalk in front of a nearby apartment complex; the other was across the street from the group. After the shooting stopped,[5] the shooter across the street said, "Fuck 18th Street" and "La Mara," a commonly used name for the criminal street gang Mara Salvatrucha or M.S. Like Barragan and Villanueva, Mora was unable to identify either shooter.[6]

According to Roger Negroe, the dean at Berendo Middle School, on August 18, 2012, Art was a student at the school. He started attending Berendo the year before, after transferring from another school. Negroe described Art as "very quiet" for the most part but noted that on a couple of occasions he was "disruptive" in class.

---

[5]    Mora heard a total of about 14 gunshots.

[6]    During the adjudication hearing, counsel stipulated that the juvenile court could review the videotape of the interrogation, marked as Exhibit 6, outside of the courtroom so that it did not need to be played in open court. While the tape is incorrectly referenced as an "audio," it is clear from the hearing transcript that counsel intended to stipulate as to the videotape marked as Exhibit 6, which was later admitted into evidence.

Los Angeles School Police Officer Daniel East, who was assigned to Berendo Middle School, stopped Art in May or June 2012 for being truant. Art told Officer East that he wanted to be a member of a gang or tagging crew, but he did not know which gang. Art stated that whatever gang he joined, he would be "loyal to that gang." Officer East searched Art's backpack and found some paperwork with "gang-style or graffiti writing." On August 20, 2012, Officer East encountered Art at school and noticed that he had cut his hair "pretty close to shaved."

Los Angeles Police Officer Marshall Cooley, whom the prosecution called as a gang expert, testified that he first met Art's mother on August 17, 2012, when she came into the police station and asked to speak to an officer about the M.S. gang. She told Officer Cooley she believed Art was affiliated with M.S. and that she was concerned for his well-being. She said that she had heard about a shooting on Leeward and did not know if her son was involved.

Officer Cooley then investigated Art using the Los Angeles Police Department databases and learned that he previously had been stopped with other gang members and "self-admitted the moniker of Casper from M.S. 13 Tiny Winos." Officer Cooley also viewed Art's Facebook page where he saw numerous ties to M.S. Specifically, there was a picture of two M.S. gang members who had been shot and killed with the caption, "rest in peace." He also observed a photograph of spray painting of "18th Street," a rival of the M.S. gang, crossed out on either the ground or a wall. Officer Cooley also identified Art in photographs making M.S. gang signs. In one photograph, Art was making gang signs in front of a wall with "M.S." written at the top and "Westside M.S. 13" with the moniker "Casper" to the left of Art. Officer Cooley opined based on a hypothetical that the crimes were committed for the benefit of, at the direction of, and in association with the M.S. criminal street gang.

2. *The Defense*

The defense called two witnesses, Art's mother Helen C., and a video expert, Michael Jones. Helen C. testified that on August 17, 2012, Art walked home from

10

school, returning around 4:30 p.m. Art stayed home while Helen C. ran errands. When Helen C. returned home around 6:20 p.m., Art was not home.

Around 9:00 p.m., Helen C. had not yet heard from Art and decided to go to the police station to make a missing person's report. As she was getting into her car, she heard a commotion down the street. Worried about her son, Helen C. drove in the direction of the commotion. She spoke to a police officer who stated that someone had been shot and killed. Helen C. inquired as to the age of the victim, but the officer said that he did not yet have that information. Helen C. then drove to the police station and filed a missing person's report for Art with an officer,[7] and she returned home.

At about 11:26 p.m., Helen C. received a telephone call from Art's friend Joshua, who lived in Arcadia.[8] Joshua said that Art was with him and apologized for not reminding Art to call home. Joshua's mother told Helen C. she would drop off Art within the next hour. Helen C. also spoke to Art to confirm he was there. According to Helen C., Art arrived home at 12:42 a.m. Helen C. testified that she remembered the time because she was upset with Art and showed him the time on her phone. Art was wearing a black T-shirt with little "Scooby" characters and jeans.

On August 20, 2012, Helen C. received a telephone call from the police department, asking her to come to the station to close out the missing person's report. She arrived at the station sometime after 4:00 p.m. and answered some questions. The officer then told Helen C. that Art was being detained for a crime.

The officer showed Helen C. a still shot on a computer and told her, "This is your son." Helen C. told the officer she did not think the person was Art because the person in the picture was "taller" and "thicker" than Art, the picture did not show Art's bald birth mark on the left side of his forehead, and the person was wearing different clothes from

---

[7] Helen C. identified the officer phonetically as Officer "Conner," but it appears from the earlier testimony of Officer Cooley that she had spoken with Officer Cooley.

[8] Helen C. was able to recall the time of the call by obtaining a copy of her cell phone bill from her carrier.

what Art had. Helen C. repeatedly told the officer that the person in the picture was not her son.

Helen C. testified she knew that Art was known as Casper and that Casper is a gang name, but she denied knowing that Art was connected to the M.S. gang. The People impeached Helen C. with a video from August 20, in which she stated to Detective Arteaga, "I know my son to be affiliated somehow with M.S. in the past." When asked how she knew, Helen C. stated that Art told her he was affiliated with M.S. and he "posted . . . all this stupid stuff on Facebook."

Michael Jones, an expert in audio and video enhancement, testified that the two outdoor security cameras that recorded the shooting were mounted 16 feet and 16½ feet, respectively, from the ground. He opined that camera angles affect how objects and people appear and that the video taken in the case from its elevated position would distort how the subject walking across the screen would appear.

3. *The Juvenile Court's Ruling*

During closing argument, the juvenile court addressed the prosecutor: "the video identification and the quality of the video . . . have the court concerned with establishing an I.D. off of that information, off of that evidence. To be quite frank with you. I just — I cannot tell." The prosecutor responded that "[i]f that's all we had, we'd be in a completely different situation," and he acknowledged that no witness identified Art from the video. The prosecutor urged the court to consider the "totality of the circumstances," including the video, Art's confession, and Art's statement to his girlfriend.

Before adjudicating the matter, the juvenile court stated, "I carefully reviewed the pictures, the photographs that were admitted by the defense, and with regard to the video evidence, that standing alone would not be sufficient for the court to sustain a petition. . . . And we know, even from when there is a video, it may be impossible to tell. However, when the court applies the reasonable interpretation to the state of the evidence, the court is hard-pressed to come to a different conclusion than that which I'm about to announce." The juvenile court found that the People had proven all three counts

12

beyond a reasonable doubt, sustained one count of first-degree murder and two counts of attempted murder, and found the firearm and gang allegations to be true.

## G. *The Disposition Hearing*

At the disposition hearing held on August 22, 2013, the juvenile court noted that the murder charge carried a statutory minimum of 25 years with a maximum of life but that it could not impose a life sentence on a minor. It therefore stated it would "set the timeframe at 25" years and "just sentence him on one of the counts." Neither side objected. The juvenile court committed Art to the Department of Juvenile Justice.

## DISCUSSION

On appeal, Art challenges the juvenile court's denial of his motion to suppress the statements he made to the officers while in custody as violating his Fifth Amendment right against self-incrimination[9] and his due process rights under the Fourteenth Amendment. In his motion to suppress, Art invoked both grounds for suppression of his confession. Art contends that the juvenile court should have excluded the statements because they were made after he requested an attorney and on the basis that the statements were involuntary. We conclude that Art unequivocally requested an attorney prior to his confession and that once he made this request, all questioning should have stopped.

## A. *Standard of Review*

"'On review of a trial court's decision on a *Miranda* issue, we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of

---

[9]    A defendant's Sixth Amendment right to counsel only attaches upon the initiation of an adversarial criminal proceeding (*Davis v. United States* (1994) 512 U.S. 452, 456 [114 S.Ct. 2350, 129 L.Ed.2d 362] (*Davis*)) and thus does not apply here.

13

*Miranda.*' [Citation.]" (*People v. Hensley* (2014) 59 Cal.4th 788, 809; accord, *People v. Bradford* (1997) 14 Cal.4th 1005, 1032-1033; *People v. Thomas* (2012) 211 Cal.App.4th 987, 1006.) Further, "[w]e apply federal standards in reviewing defendant's claim that the challenged statements were elicited from him in violation of *Miranda.* [Citations.]" (*Bradford*, *supra*, at p.1033.)

Because the only evidence submitted in support of Art's motion to suppress was the transcript of the interrogation, there is no dispute about the statement Art made at issue here. Accordingly, we will "engage in a de novo review of the legal question of whether the statement at issue was ambiguous or equivocal." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.)

## B. *Application of Miranda and Its Progeny*

Before the police can perform a custodial interrogation, the suspect must first be advised of his or her right to remain silent, to the presence of an attorney, and to appointed counsel if indigent. (*Miranda*, *supra*, 384 U.S. at p. 479; *Edwards v. Arizona* (1981) 451 U.S. 477, 481-482 [101 S.Ct. 1880, 68 L.Ed.2d 378] (*Edwards*).)

Once a suspect is advised of his or her rights, the suspect can be found to have waived those rights by continuing to answer questions. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 [130 S.Ct. 2250, 176 L.Ed.2d 1098] [defendant waived *Miranda* rights where he received and understood *Miranda* warnings, did not invoke his rights, and made voluntary statement to the police]; *North Carolina v. Butler* (1979) 441 U.S. 369, 373 [99 S.Ct. 1755, 60 L.Ed.2d 286] [waiver of *Miranda* rights in some cases can be "inferred from the actions and words of the person interrogated," without an explicit waiver].)

However, even where an accused waives his or her *Miranda* rights, once the accused asserts his or her right to counsel, "the interrogation must cease until an attorney is present." (*Miranda*, *supra*, 384 U.S. at p. 474; see also *Davis*, *supra*, 512 U.S. at p. 458; *Edwards*, *supra*, 451 U.S. at pp. 484-485.) Subsequent statements are presumed involuntary and inadmissible if made without a lawyer. (*Edwards*, *supra*, at p. 482.)

14

Questioning can only continue where the accused initiates further communication. (*Id.* at p. 485.)

In *Edwards*, the court held that the defendant's confession violated his Fifth and Fourteenth Amendment rights because, after requesting an attorney, the next day he was told that "'he had'" to meet with detectives, and only after the detectives initiated further conversation did the defendant implicate himself in the crime. (*Edwards*, *supra*, 451 U.S. at p. 479.) The court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [An accused] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Id.* at pp. 484-485, fn. omitted.)

However, questioning does not need to cease where the request for counsel is "ambiguous or equivocal." (*Davis*, *supra*, 512 U.S. at p. 459; accord, *Berghuis v. Thompkins*, *supra*, 560 U.S. at p. 381.) The Supreme Court in *Davis* held, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." (*Davis*, *supra*, at p. 459.) The court declined to adopt a rule that would require officers to ask clarifying questions where the request for a lawyer was ambiguous or equivocal, instead holding that officers have no obligation to stop questioning. (*Id.* at pp. 459-460.)

Under this standard, the court in *Davis* held that the statement, "'[m]aybe I should talk to a lawyer,'" was not a request for counsel, and therefore the officers were not required to stop their questioning. (*Davis*, *supra*, 512 U.S. at p. 462.) Other courts have construed similar statements to be equivocal, thus not invoking an accused's right to counsel. (See, e.g., *Clark v. Murphy* (9th Cir. 2003) 331 F.3d 1062, 1069, 1071 ["I think I would like to talk to a lawyer" held not to be unambiguous and unequivocal]; *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219 ["'[i]f you can bring me a lawyer, . . . that

15

way I can tell you everything that I know" held to be "conditional, ambiguous, and equivocal" in light of totality of circumstances]; *People v. Bacon*, *supra*, 50 Cal.4th at pp. 1104, 1105 ["I think it'd probably be a good idea for me to get an attorney" held to be ambiguous or equivocal].)

Other courts have found statements using words similar to "can I have a lawyer" to be sufficiently clear to invoke the accused's right to counsel. (See, e.g., *Alvarez v. Gomez* (9th Cir. 1999) 185 F.3d 995, 998 [questions by defendant found to be unequivocal request for an attorney, including "'Can I get an attorney right now, man?'" "'You can have attorney right now?'" "'Well, like right now you got one?'"]; *United States v. De La Jara* (9th Cir. 1992) 973 F.2d 746, 750 ["Can I call my attorney?" or "I should call my lawyer" invoked right to counsel]; *Smith v. Endell* (9th Cir. 1988) 860 F.2d 1528, 1529, 1531 ["Can I talk to a lawyer?" and "I think maybe you're looking at me as a suspect, and I should talk to a lawyer" not ambiguous or equivocal].)

Art urges us, in considering a juvenile's invocation of his or her right to an attorney, to consider the age and lack of sophistication of the juvenile at the time of the interrogation. We now turn to the question of the proper standard to be applied in the case of a juvenile.

## C. *Whether a Juvenile Has Waived Miranda Rights and Whether a Juvenile Has Requested an Attorney Must Take Into Account His or Her Age*

We start our analysis by looking at the standard the courts have applied in considering whether a juvenile accused of a crime has waived his or her *Miranda* rights after being advised of those rights.

### 1. *Whether a juvenile has knowingly and voluntarily waived his or her Miranda rights requires consideration of the totality of circumstances, including the juvenile's age.*

The United States Supreme Court has held that in determining whether a juvenile has knowingly and voluntarily waived his or her rights under *Miranda*, the court should

consider the totality of the circumstances surrounding the confession, including the juvenile's age. (See *Fare v. Michael C.* (1979) 442 U.S. 707, 720-723 [99 S.Ct. 2560, 61 L.Ed.2d 197] (*Fare*) [finding 16 year old's request to speak with his probation officer was not invocation of right to remain silent, reviewing totality of the circumstances of interrogation]; *People v. Lessie* (2010) 47 Cal.4th 1152, 1169-1170 [applying totality of circumstances test to find that 16 year old had not invoked Fifth Amendment rights when he asked to speak with his father during interrogation].)

The court in *Fare* held, "the determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." (*Fare*, *supra*, 442 U.S. at pp. 724-725.) As to the unique nature of juveniles, the court held further: "The totality approach permits— indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. [Citation.]" (*Id.* at p. 725.)

The Supreme Court in *Fare* specifically addressed the "special concerns" that must be considered with juveniles, holding that the juvenile court has the expertise to "take into account those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved. Where the age and experience of a juvenile indicate that his request for his probation officer or his parents is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination. At the same time, that approach refrains from imposing rigid restraints on police and courts in dealing with an experienced older juvenile with an extensive prior record who knowingly and intelligently waives his Fifth Amendment rights and voluntarily consents to interrogation." (*Fare*, *supra*, 442 U.S. at pp. 725-726.)

17

The court in *Fare* found that the juvenile had voluntarily and knowingly waived his Fifth Amendment rights, after consideration of the fact that he was 16½ years old at the time of the confession, had several prior arrests, spent time in youth camp, was on full-time probation at the time of the interrogation, had his rights explained to him multiple times, there was no indication that he did not understand what the officers told him, and he clearly expressed his willingness to waive his rights and continue the interrogation. (*Fare*, *supra*, 442 U.S. at p. 726.)[10]

We turn next to the question of what standard applies in determining whether a juvenile, after voluntarily waiving his or her rights under *Miranda*, makes a statement that is sufficiently unequivocal to invoke the juvenile's right to an attorney.

2. *Whether a juvenile has made an unequivocal request for an attorney requires consideration of the juvenile's age.*

While the determination of whether an accused has knowingly and voluntarily waived his or her *Miranda* rights requires consideration of the totality of the circumstances to determine the accused's subjective state of mind (see *Fare*, *supra*, 442 U.S. at pp. 724-725), evaluation of whether an accused after a waiver has unequivocally requested an attorney requires an objective inquiry. (See *Davis*, *supra*, 512 U.S. at pp. 458-459 ["[t]o avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry"]; *People v. Nelson* (2012) 53 Cal.4th 367, 376, 378 (*Nelson*) [applying *Davis*'s objective inquiry standard to find that 15-year old had not asserted right to counsel before making confession.])

Our Supreme Court in *Nelson* held that the appellate court was in error in applying a subjective "totality of the circumstances" test in order to determine whether the juvenile

_____

**10**     For the first time on appeal, Art contends that the *Miranda* warnings he received were inadequate to convey their meaning to a 13-year-old and that he did not knowingly and voluntarily waive his *Miranda* rights. We need not reach this issue because we conclude that Art invoked his right to counsel and all questioning should have ceased.

suspect, after waiving his *Miranda* rights, intended to invoke his right to counsel. (*Nelson*, *supra*, 53 Cal.4th at p. 384.)  First, the court noted that both *Fare* and *Lessie*, requiring consideration of a suspect's youth as part of the totality of the circumstances analysis, "are inapposite because those decisions addressed whether the juveniles involved made valid *waivers* of their *Miranda* rights." (*Ibid*.)  The court held: "*Fare* and *Lessie* do not support substitution of a subjective test in place of *Davis*'s objective approach when evaluating whether a juvenile suspect, having waived the *Miranda* rights, later asserted the right to counsel or right to silence." (*Id*. at p. 385.)  However, the court went on to find, "it is correct that the objectively apparent circumstances in which a suspect made a postwaiver statement are relevant to an officer's understanding of the statement as an assertion of *Miranda* rights." (*Ibid.*)

Moreover, while the *Nelson* case was pending, the United States Supreme Court decided *J. D. B. v. North Carolina* (2011) 564 U.S. ___, ___ [131 S.Ct. 2394, 2398, 180 L.Ed.2d 310, 318] (*J. D. B.*), in which it considered "whether the age of a child subjected to police questioning is relevant to the custody analysis of *Miranda* . . . ."  The court in *J. D. B.* considered whether a 13-year-old seventh grader who was questioned by two police officers with two school administrators present in a closed school conference room was in custody for the purpose of application of *Miranda*.  (*J. D. B.*, *supra*, at pp. 2398-2399.)  The court held that, while the question of whether a suspect is in police custody for purposes of application of *Miranda* is an objective inquiry, "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test.  This is not to say that a child's age will be a determinative, or even a significant, factor in every case. . . .  It is, however, a reality that courts cannot simply ignore." (*J. D. B., supra,* at p. 2406, fn. omitted.)

While the United States Supreme Court has not addressed the type of objective inquiry a court should make when considering whether a juvenile, after waiving *Miranda* rights, has invoked his or her right to an attorney, the same considerations that informed the *J. D. B.* decision apply to this inquiry.  Indeed, the court in *Nelson*, while finding that

the juvenile there had not invoked his right to an attorney by his conditional statement that he would not take a polygraph test unless his mother or a lawyer was present, addressed the holding in *J. D. B.*, noting: "While *J. D. B.*'s analysis generally supports the view that a juvenile suspect's known or objectively apparent age is a factor to consider in an invocation determination, knowledge of defendant's age would not have altered a reasonable officer's understanding of defendant's statements in the circumstances here. As indicated, defendant, who was 15 years old, appeared confident and mature." (*Nelson*, *supra*, 53 Cal.4th at p. 383, fn. 7.)[11]

We find that, as in the custody context addressed in *J. D. B.*, a court should consider a juvenile's age for purposes of analyzing whether the juvenile has unambiguously invoked his or her right to counsel. As the court in *J. D. B.* held: "Even for an adult, the physical and psychological isolation of custodial interrogation can 'undermine the individual's will to resist and . . . compel him to speak where he would not otherwise do so freely.' [Citation.] Indeed, the pressure of custodial interrogation is so immense that it 'can induce a frighteningly high percentage of people to confess to crimes they never committed.' [Citations.] That risk is all the more troubling—and recent studies suggest, all the more acute—when the subject of custodial interrogation is a juvenile. [Citation.]" (*J. D. B.*, *supra*, 131 S.Ct. at p. 2401.)

In reaching its holding, the court in *J. D. B.* reviewed the other contexts in which the Supreme Court has "observed that children 'generally are less mature and responsible than adults,' [citation]; that they 'often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them,' [citation]; that they 'are more vulnerable or susceptible to . . . outside pressures' than adults [citations]; and so

---

[11] The court in *Nelson* also acknowledged the significance of the circumstances surrounding a particular statement as to whether it was an unambiguous request for counsel. "We caution, however, that a particular statement found insufficiently clear in the circumstances of one case may nonetheless be deemed an unambiguous and unequivocal invocation when considered in the context of another case." (*Nelson*, *supra*, 53 Cal.4th at p. 385.)

20

on." (*J. D. B.*, *supra*, 131 S.Ct. at p. 2403.) In particular, the Supreme Court has considered the maturity level of juveniles in barring capital punishment for juveniles (*Roper v. Simmons* (2005) 543 U.S. 551, 568 [125 S.Ct. 1183, 161 L.Ed.2d 1]); barring a sentence of life without parole for juveniles convicted of nonhomicide offenses (*Graham v. Florida* (2010) 560 U.S. 48, 67 [130 S.Ct. 2011, 176 L.Ed.2d 825]); and requiring consideration of a juvenile's "diminished culpability and heightened capacity for change" before imposing a sentence of life without parole for homicide offenses (*Miller v. Alabama* (2012) ___ U.S. ___, ___ [132 S.Ct. 2455, 2469, 2475, 183 L.Ed.2d 407]).

The court in *J. D. B.* concluded that "including age as part of the custody analysis requires officers neither to consider circumstances 'unknowable' to them, [citation] nor to 'anticipat[e] the frailties or idiosyncrasies' of the particular suspect whom they question [citation]. The same 'wide basis of community experience' that makes it possible, as an objective matter, 'to determine what is to be expected' of children in other contexts [citations] likewise makes it possible to know what to expect of children subjected to police questioning." (*J. D. B.*, *supra*, 131 S.Ct. at p. 2404.) The court reversed and remanded the case for the state court to take into account "all of the relevant circumstances of the interrogation, including J. D. B.'s age at the time." (*Id*. at p. 2408.)

Applying the same standard to the context of a post-waiver invocation of a juvenile's right to counsel, we find that this analysis requires consideration of whether a reasonable officer in light of the circumstances known to the officer, or that would have been objectively apparent to a reasonable officer, including the juvenile's age, would understand the statement by the juvenile to be a request for an attorney.

We next turn to the facts of this case.

21

3. *Art made an unequivocal request for an attorney.*

In this case, the detectives knew at the time of the interrogation that Art was 13 and an eighth grade student in middle school.[12]  While neither the juvenile court nor this court has had the benefit of viewing the videotape for the purpose of considering the circumstances of Art's statements to the officers in considering the motion to suppress, we find that Art's age of 13 and middle school level of education, combined with his repeated requests for his mother, would have made his lack of maturity and sophistication objectively apparent to a reasonable officer.[13]  In this context, Art's statement after viewing the video of the shooting, "Could I have an attorney?  Because that's not me," was an unequivocal request for an attorney.[14]

We do not find the People's argument credible that a reasonable detective would have believed that 13-year-old Art, in stating, "Could I have an attorney?  Because that's not me" was merely inquiring whether he could have a lawyer in court to prove his

---

[12]     Art provided this information to the detectives at the beginning of the interrogation.

[13]     While Art T. uses profanity extensively during his interrogation, his repeated requests for his mother in the face of the detectives' accusations show his lack of maturity and sophistication.

[14]     We also note that the statement, "Could I have an attorney?" is closer to the question "Can I get an attorney right now" and "Can I call my attorney?" found to be unequivocal in *Alvarez v. Gomez*, *supra*, 185 F.3d at p. 998 and *United States v. De La Jara*, *supra*, 973 F.2d at p. 750, than the statements, "[m]aybe I should talk to a lawyer" and "I think I would like to talk to a lawyer" found to be equivocal in *Davis*, *supra*, 512 U.S. at p. 462 and *Clark v. Murphy*, *supra*, 331 F.3d at pp. 1069, 1071.  Therefore, even if this request had been made by an adult, we believe it would have been an unequivocal request for counsel.  In this case, the request was particularly clear given the circumstances applicable to a juvenile.  We reach the question of the standard applicable to a juvenile because the determination of whether the statement made by Art was an unequivocal request for an attorney must be considered in light of all the circumstances known to the officer or reasonably apparent to a reasonable officer, including Art's age and lack of sophistication.

22

innocence.[15]  The People's further argument that Art waived his right to an attorney by continuing to answer questions must also be rejected as contrary to the law.  (See *Edwards*, *supra*, 451 U.S. at pp. 484-485.)

Accordingly, once Art made a request for an attorney, all questioning should have ceased.  (See *Davis*, *supra*, 512 U.S. at 458; *Edwards*, *supra*, 451 U.S. at pp. 484-485.) All statements made by Art to the officers after he requested an attorney are presumed involuntary and inadmissible, and should have been suppressed.  (See *Edwards*, *supra*, 451 U.S. at p. 482; *Miranda*, *supra*, 384 U.S. at p. 479.)[16]

## D.  *The Error Was Not Harmless Beyond a Reasonable Doubt*

When statements are obtained in violation of *Miranda*, as they were in this case, the error is reviewed under the federal "harmless beyond a reasonable doubt" standard set forth in *Chapman*.  (*Arizona v. Fulminante* (1991) 499 U.S. 279, 297, 302 [111 S.Ct. 1246, 113 L.Ed.2d 302] (*Arizona*) [use of coerced confession not harmless error]; *People v. Cahill* (1993) 5 Cal.4th 478, 510 (*Cahill*) [federal harmless error standard applicable to inadmissible confession admitted in a California trial]; accord, *People v. Thomas* (2011) 51 Cal.4th 449, 498 [admission of defendant's confession harmless error where

---

[15]  At oral argument, the People did not focus on whether the statement "Could I have an attorney" was unequivocal, but instead argued that the addition of the statement "[b]ecause that's not me" somehow turned this request into an equivocal request because it showed that Art was only inquiring as to whether he would have an attorney at trial. As noted above, an objective officer hearing this request from a 13-year-old would not believe that the phrase "because that's not me" somehow converted Art's request into one that was equivocal.  To the contrary, it appears more reasonable that it was precisely because the detectives were telling this 13-year-old that they knew that he was the killer in the video that he was requesting an attorney to be present as he was being interrogated.

[16]  Because we find that Art's Fifth Amendment right against self-incrimination was violated by the officers continuing to question him after he requested an attorney, we do not reach the question whether his request for his mother was an invocation of his right to counsel or whether his confession was involuntary.  We also do not reach the question of whether the statements subsequently made by Art to his girlfriend should have been suppressed.

cumulative to stronger evidence]; *In re Z.A.* (2012) 207 Cal.App.4th 1401, 1422-1423) [highly inculpatory statements admitted in violation of *Miranda* not harmless beyond reasonable doubt].

The People bear the burden of proving that the error was harmless beyond a reasonable doubt. (See *Arizona*, *supra*, 499 U.S. at 297; accord, *Brecht v. Abrahamson* (1993) 507 U.S. 619, 629-630 [113 S.Ct. 1710, 123 L.Ed.2d 353].) In applying this standard, "'[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" (*Chapman*, *supra*, 386 U.S. at p. 23, quoting *Fahy v. Connecticut* (1963) 375 U.S. 85, 86-87 [84 S.Ct. 229, 11 L.Ed.2d 171].) As the court held in *Arizona*, in finding the state failed to meet its burden of proving that use of a coerced confession was harmless error beyond a reasonable doubt, "[a] confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . .' [Citation.]" (*Arizona*, *supra*, at p. 296; accord, *Cahill, supra*, 5 Cal.4th at p. 497 ["'the confession operates as a kind of evidentiary bombshell which shatters the defense'"].)

In this case, when the juvenile court stated that it could not tell if Art was the shooter from the video, the prosecutor urged the court to consider the "totality of the circumstances," including the video, Art's confession, and his statements to his girlfriend. In reaching its ruling, the juvenile court expressed its view that the "video evidence . . . standing alone would not be sufficient for the court to sustain a petition." The court ruled, however, that based on "the totality of the evidence," it is "hard-pressed to come to a different conclusion than that which [it was] about to announce." The court then sustained all three counts of the petition and found the enhancement allegations to be true.

Because the juvenile court relied on the confession to sustain the petition in light of the weakness of the video evidence, we find that the confession was an essential factor in the juvenile court's ruling sustaining the petition, and that the People have not proven

that the error in admitting Art's statements was harmless beyond a reasonable doubt within the meaning of *Chapman*.[17]

## DISPOSITION

The juvenile court's jurisdictional findings and dispositional order are reversed. The matter is remanded for a new adjudication hearing consistent with the views expressed herein.

FEUER, J.[*]

We concur:

WOODS, Acting P. J.

ZELON, J.

---

[17] The People argue that even without Art's confession, the court had sufficient evidence of guilt based on the incriminating statements Art made to his girlfriend during a telephone call made following the interrogation. However, as noted above, we do not have the recording or transcript of the statements made by Art to his girlfriend in the record on appeal. On the record before us, it is clear that Art's confession was central to the juvenile court's ruling. We also note that on remand, Art may renew his objection to the admissibility of his telephone conversation with his girlfriend, which issue the juvenile court never reached.

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.