**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ART TOBIAS,<br>          *Plaintiff-Appellee*,<br><br>v.<br><br>MICHAEL ARTEAGA; JEFF CORTINA;<br>J. MOTTO; JULIAN PERE,<br>          *Defendants-Appellants.* | No. 18-56360<br><br>D.C. No.<br>2:17-cv-01076-<br>DSF-AS<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted October 15, 2019
Memorandum Disposition Filed February 25, 2020
Petition for Rehearing Granted and Submission Vacated
August 17, 2020
Resubmitted April 20, 2021
Pasadena, California

Filed April 27, 2021

Before:  Kim McLane Wardlaw and Daniel P. Collins,
Circuit Judges, and Benjamin H. Settle,* District Judge.

Opinion by Judge Wardlaw;
Partial Concurrence and Partial Dissent by Judge Collins

---

* The Honorable Benjamin H. Settle, United States District Judge for the Western District of Washington, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel affirmed in part and reversed in part the district court's order denying, on summary judgment, qualified immunity to Los Angeles Police Department detectives in an action brought pursuant to 42 U.S.C. § 1983 alleging that defendants coerced plaintiff's confession, when he was thirteen years old, for a murder he did not commit.

The panel affirmed the district court's denial of qualified immunity on the Fifth Amendment claims that the officers continued to question plaintiff after he invoked his *Miranda* right to silence and that they engaged in unconstitutional coercive questioning tactics. The panel held that it was clearly established at the time of plaintiff's interrogation that the statement "Could I have an attorney? Because that's not me," was an unambiguous request for an attorney. It was also established at the time of plaintiff's interrogation that a coercive interrogation exists when the totality of the circumstances shows that the officer's tactics undermined the suspect's ability to exercise his free will, rendering his statements involuntary. The panel concluded that under this clearly established law, Detective Arteaga violated plaintiff's Fifth Amendment rights with his repeated assertions that the court would consider plaintiff a "cold blooded killer" and "might throw the book at [him]" if he did not confess.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that although Detectives Cortina and Pere did not make threats of harsher punishment based on lack of cooperation, to the extent they were aware of the violation as it happened, they may have had a duty to intercede and would not be entitled to qualified immunity. Because neither side presented evidence as to Cortina and Pere's involvement in the interrogation, the panel remanded for the district court to consider in the first instance whether there were material facts in dispute as to Cortina and Pere's liability for Arteaga's actions.

The panel held that the officers were entitled to qualified immunity as to plaintiff's Fifth and Fourteenth Amendment fabrication-of-evidence claim, asserted under *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc), to the extent that the claim was based on the contention that plaintiff's confession was the asserted fabricated evidence.

The panel reversed the denial of qualified immunity on plaintiff's Fourteenth Amendment substantive due process claim because it was not clearly established that the abusive interrogation techniques used by the officers rose to the level of abuse of power that shocked the conscience.

Concurring in part, concurring in the judgment in part and dissenting in part, Judge Collins agreed with the majority that the relevant officers involved in the interrogation were not entitled to qualified immunity with respect to plaintiff's Fifth Amendment right to counsel claim, and he therefore concurred to that extent in Part III(A) of the opinion. He also agreed with the majority's ultimate conclusion to reverse the district court's denial of qualified immunity with respect to plaintiff's Fourteenth Amendment due process claim, but his reasoning differed somewhat from the majority's and so he concurred only in the judgment as to Part III(C). Judge Collins agreed with the majority that

the officers were entitled to summary judgment on plaintiff's fabrication-of-evidence claim under *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc), to the extent that that claim was based on the allegedly coerced confession. Lastly, because in Judge Collins's view then-existing precedent did not clearly establish that the officers' combination of tactics would be deemed coercive, he would reverse the district court's denial of qualified immunity with respect to plaintiff's coerced confession claim. He therefore dissented from the majority's opinion as to Part III(B).

**COUNSEL**

Kevin E. Gilbert (argued), Orbach Huff Suarez & Henderson, Pleasanton, California; Timothy T. Coates, Greines Martin Stein & Richland LLP, Los Angeles, California; for Defendants-Appellants.

Calvin House (argued), Gutierrez Preciado & House LLP, Pasadena, California, for Defendants.

David B. Owens (argued), Anand Swaminathan, and Megan Pierce, Loevy & Loevy, Chicago, Illinois, for Plaintiff-Appellee.

Steven A. Drizin and Laura H. Nirider, Bluhm Legal Clinic, Northwestern Pritzker School of Law, Chicago, Illinois; Seth P. Waxman and Drew Van Denover, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Alan E. Schoenfeld, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; for Amicus Curiae Center on Wrongful Convictions of Youth.

Clark M. Neily III and Jay R. Schweikert, Cato Institute, Washington, D.C., for Amicus Curiae The Cato Institute.

**OPINION**

WARDLAW, Circuit Judge:

Thirteen year old Art Tobias confessed to the murder of Alex Castaneda—a murder he did not commit—after an interrogation in which Los Angeles Police Department (LAPD) Detectives Michael Arteaga, Julian Pere, and Jeff Cortina ignored his request for an attorney, told him that he would look like a "cold-blooded killer" if he did not confess, and suggested that if he were to exercise his right to remain silent he would receive harsher treatment by the court. Tobias was convicted in juvenile court and sentenced to 25 years' imprisonment. The California Court of Appeal reversed the conviction, concluding that Tobias's confession should have been suppressed by the juvenile court because the detectives failed to respect his unambiguous request for an attorney. All parties now agree that Tobias did not murder Alex Castaneda.

This appeal arises from Tobias's subsequent 42 U.S.C. § 1983 action against the three LAPD Detectives who conducted the interrogation in which Tobias confessed to killing Castaneda. Tobias asserted violations of his Fifth and Fourteenth Amendment rights. The LAPD detectives now appeal the district court's denial of their motion for summary judgment based on qualified immunity for their interrogation tactics. We affirm the denial of qualified immunity on the Fifth Amendment claims that the officers continued to question Tobias after he invoked his right to silence and that they engaged in unconstitutional coercive questioning tactics. We reverse the denial of qualified immunity on Tobias's Fourteenth Amendment substantive due process claim because it was not clearly established that the abusive

interrogation techniques used by the officers rose to the level of "abuse of power that shocks the conscience."[1]

## I.

### A.

Alex Castaneda was shot and killed in Los Angeles in the early morning of August 18, 2012. A security camera on a nearby building captured video of the shooter. LAPD Detectives John Motto and Julian Pere were among the officers who responded to the scene, where they learned from witnesses that one of the assailants had said "Fuck 18th Street" and "Salvatrucha," suggesting that the shooting was related to an ongoing feud between the Mara Salvatrucha (MS-13) and 18th Street gangs.

The detectives identified 13-year-old Art Tobias as a suspect after showing the video of the shooting to LAPD gang enforcement officer Marshall Cooley. Cooley had never met Tobias in person, but earlier that evening he had seen photos of him when Tobias's mother, Helen Contreras,

---

[1] Detectives Arteaga, Cortina, and Pere and a fourth officer, Detective Motto, also challenge the district court's denial of qualified immunity as to Tobias's Fifth and Fourteenth Amendment fabrication-of-evidence claim, asserted under *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc), but only to the extent that the claim is based on the contention that Tobias's confession is the asserted fabricated evidence. We have held that coerced confession claims are not cognizable under a *Devereaux* fabrication-of-evidence theory. *See Hall v. City of Los Angeles*, 697 F.3d 1059, 1069–70 (9th Cir. 2012). "[O]fficers are entitled to qualified immunity under § 1983 unless . . . they violated a federal statutory or constitutional right." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). As the officers cannot have violated a constitutional right under a fabrication-of-the-evidence theory, the officers are entitled to qualified immunity on this claim.

came to the police station to report her son missing. Cooley stated that the shooter in the video "uncannily resembled" the photos of Tobias. This identification was seconded by Officer Dora Born, another gang enforcement officer who had never met Tobias but claimed to be familiar with him from photos.

Detectives Motto and Michael Arteaga then went to Berendo Middle School, where Tobias was a student. They asked Daniel East, a Los Angeles Unified School District (LAUSD) police officer assigned to the school, and Roger Negroe, a dean of the school, if they were able to identify the shooter in the video. At first, Officer East remarked that the person in the video looked "large . . . to be a middle school student" and said he had "a hard time IDing that person." After the detectives continued to press him, East eventually stated he thought that the person on the video was Art Tobias, but he noted Tobias was "so much smaller in real life" and had a different hairstyle. Dean Negroe could not identify the shooter from the video. However, after leaving the meeting with the detectives, Dean Negroe ran into Tobias, concluded he resembled the shooter in the video, and informed the detectives of his revised opinion. The detectives then arrested Tobias and brought him to the police station.

## B.

At the station, Tobias was brought into an interview room with Detectives Pere and Jeff Cortina.[2] After several background questions, the detectives began asking Tobias whether he was affiliated with a gang. Tobias admitted that

---

[2] To the extent this opinion references information from sealed documents, the information is unsealed for purposes of the disposition.

his previous school "had [him] on gang file" for MS-13, but explained that he was not actually in the gang. The detectives then asked Tobias a series of questions to determine whether he was sufficiently mature to differentiate right from wrong, pursuant to *In re Gladys R.*, 464 P.2d 127 (Cal. 1970). It was not until after these questions, roughly 20 minutes into the interrogation, that Detective Cortina read Tobias his *Miranda* rights. Tobias stated that he understood his rights.

The detectives then showed Tobias the security camera video of the shooter. Tobias asked, "Who is that?" and Detective Pere responded, "That, my friend, would be you." Tobias immediately and repeatedly denied that he was the person in the video. When the officers told him that the shooting had taken place near downtown Los Angeles around midnight, Tobias explained that he had been miles away in Arcadia with a friend that night and that his friend's mother had dropped him off at home before midnight. The detectives persisted in accusing Tobias of the shooting, falsely telling him, "somebody gave you up."

Then the following exchange took place:

> Det. Pere: Okay. Well, I—you know what? We're here to speak to you to get your statement. Now, if your statement is that that's not you, don't worry. We're going to write it down just the way you said. That's not—
>
> Tobias: Could I have an attorney? Because that's not me.

> Det. Pere: But—okay.    No,  don't  worry.
>           You'll have the opportunity.

Detective Cortina quickly jumped in with another question and the interrogation continued with no further acknowledgement of Tobias's request for an attorney, even though the detectives had previously told him that he "ha[d] the right to the presence of an attorney before and during any questioning."  Tobias adamantly continued to deny he was the shooter.

About 35 minutes into the interview, Detective Pere told Tobias: "[R]ight now, man, you're looking at murder.  Looks like you're going to get booked today for murder." Detectives Pere and Cortina then left the room, assuring Tobias that his mother would be in to talk to him shortly.[3]

But instead of Tobias's mother, Detective Arteaga entered the room two minutes later.  Arteaga immediately pulled his chair close to Tobias and began questioning him in an aggressive tone.  In an interrogation that lasted roughly 40 minutes, Arteaga lied to Tobias that somebody had given him up as the murderer, cursed at Tobias, told Tobias that by failing to confess he looked like a "cold-blooded killer," and brought up Tobias's "mom" multiple times.  Arteaga opened the interview by telling the 13-year-old, "I just talked to your mom right now, okay?  She's in there crying her eyes off. She's crying like a baby, bro," and later informed him, "Your mom's gone.  She—she left crying."  He also told Tobias that his mother had identified him from the video,[4]

---

[3] The record is unclear as to what extent Detectives Pere and Cortina continued to observe the interrogation.

[4] Tobias's mother had in fact identified him as the person on the video, but she later recanted the identification.

calling it "fucked up" and "fucking pitiful" that Tobias was going to "drag [his] mom into this" by forcing her to take the stand to testify against him.

Over the course of this extended interrogation, Arteaga repeatedly told Tobias that the court would "take into consideration" his young age, but that he would lose that goodwill and likely receive a harsher punishment if he continued to "lie" about not being the person on the video. As Arteaga framed it, "[y]ou're 13 years of age. Do you think they're going to throw away the key on you? No. They're going to try to get you some help. . . . But we can't help you if you're going to sit here and lie and—and just be a cold-blooded killer." As the interview went on, Arteaga pressed this point harder, insisting, "You're full of shit. And when this case is presented to a district attorney's office, they're going to see you're a cold blooded killer," and, "Okay, but I'm telling you man, we have a lot more evidence than you think, and right now when we take the case to court they're going to think you're a big time gang killer who didn't want to tell the truth, who is down for the hood. It's going to look like you're down—you're so down for the hood that you didn't want to speak. So they might throw the book at you." After Arteaga repeated that Tobias's lack of confession made him look like a "cold blooded killer" nine separate times, Tobias finally confessed.

After securing his confession, the detectives put Tobias in a room alone with his mother. Tobias immediately told her, "I'll be straight with you. I wasn't there. I was with Joshua . . . . They have a guy that looks like on the—on the camera. That's not me." When Tobias's mother asked why he had confessed if it was not him, Tobias explained, "they forced me to. They said if I—if I keep lying to them in their face that they're going to tell the judge that I'm a cold

blooded killer and that they're going to give me—they're going to—they're going to just throw the book at me and give me a lot of time. So I don't know what to do. I'm like panicking." Tobias's mother went to Detective Arteaga and told him that Tobias only confessed because "you guys told him that if he didn't confess . . . you guys were going to tell the judge who knows what the hell, okay, that he's a cold blooded murderer." She insisted that Tobias was "crying" and "scared to shit." Arteaga responded by telling her "[w]e're done with you."

## C.

The state tried Tobias in juvenile court for the Castaneda murder. Before trial, Tobias moved to suppress his confession, arguing that the detectives violated *Miranda v. Arizona*, 384 U.S. 436 (1966), by ignoring his request for an attorney and that their conduct during the interrogation was unconstitutionally coercive. *See In re Art T.*, 183 Cal. Rptr. 3d 784, 789–90 (Cal. Ct. App. 2015). The juvenile court denied the motion and the case went to trial, where a jury convicted Tobias of one count of first-degree murder and two counts of attempted murder. *See id.* at 791–93. He was sentenced to 25 years in prison. *Id.* at 793.

The California Court of Appeal reversed the trial court's ruling on the motion to suppress Tobias's statement to the police, concluding that the detectives failed to respect his unambiguous request for an attorney. *Id.* at 799–801. On remand, the charges were dismissed, and all parties—including the arresting officers—now agree that Tobias was not involved in the Castaneda murder.

D.

In February 2017, Tobias brought this 42 U.S.C. § 1983 action in federal district court against many of the officers involved in the investigation, including the appellants, LAPD Detectives Arteaga, Cortina, and Pere (the LAPD Detectives). The operative second amended complaint asserted claims based on several theories of constitutional violations, including violation of the Fifth Amendment right against self-incrimination based on a coerced confession and violation of Fourteenth Amendment substantive due process based on the detectives' conduct during the interrogation.

On March 21, 2018, the LAPD Detectives filed a motion for summary judgment, arguing that there was no triable issue of fact concerning their liability for the alleged constitutional violations and that they were entitled to qualified immunity. The district court denied the motions, finding disputed issues of material fact on all claims, and denying qualified immunity because the "rights in the context of this case are so well established that law enforcement officers must be deemed to have knowledge of them. Defendants fail to establish their entitlement to qualified immunity is 'beyond controversy.'"

The LAPD Detectives sought certification for an interlocutory appeal on the denial of qualified immunity on two claims arising out of Tobias's interrogation: (1) the alleged violation of the Fifth Amendment right against self-incrimination by the use in court of a confession that was taken in violation of Tobias's *Miranda* rights and otherwise involuntary; and (2) the alleged violation of the Fourteenth Amendment right to substantive due process because the interrogation techniques "shocked the conscience." The district court denied certification of the motion. The LAPD Detectives appealed anyway, asserting appellate jurisdiction

over the order denying qualified immunity under *Mitchell v. Forsyth*, 472 U.S. 511 (1985), and arguing that their conduct was not clearly established as unlawful at the time of Tobias's interrogation and that they are entitled to qualified immunity.[5]

## II.

"Under 28 U.S.C. § 1291, we normally have no jurisdiction to hear interlocutory appeals from the denial of summary judgment." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 944 (9th Cir. 2017). The collateral order doctrine creates an exception to this rule: we are permitted to review an interlocutory appeal to determine whether the district court committed an error of law in a denial of qualified immunity. *Id.* at 944–45; *see also Mitchell*, 472 U.S. at 527–30; *Ames v. King Cnty.*, 846 F.3d 340, 347 (9th Cir. 2017). Thus, we "have jurisdiction to decide whether, taking the facts in the light most favorable to the non-moving party, the defendants are entitled to qualified immunity." *Isayeva*, 872 F.3d at 945. "We review the district court's conclusions regarding qualified immunity *de novo* . . . consider[ing] all disputed facts in the light most favorable to the nonmoving party." *Id.* at 946 (citation omitted).

---

[5] This case was originally consolidated with an interlocutory appeal brought by Daniel East, the LAUSD police officer who identified Tobias on the video. Our disposition in *Tobias v. East*, No. 18-56245, was filed and the mandate issued. *Tobias v. East*, 803 F. App'x 93 (9th Cir.), *opinion withdrawn in part on reh'g sub nom. Tobias v. Arteaga*, 817 F. App'x 457 (9th Cir. 2020). While we have withdrawn our original disposition to the extent that it related to the LAPD officers, our decision as to Officer East remains undisturbed.

### III.

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal . . . constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted). "A right is 'clearly established' when 'the contours of the right were already delineated with sufficient clarity to make a reasonable offic[ial] in the defendant's circumstances aware that what he was doing violated the right.'" *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1114 (9th Cir. 2010) (quoting *Devereaux*, 263 F.3d at 1074); *see also Saucier v. Katz*, 533 U.S. 194, 195 (2001) (explaining that the law must "put the officer on notice that his conduct would be clearly unlawful"). "[C]ourts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the offic[er] acted reasonably in the particular circumstances that he or she faced.'" *Wesby*, 138 S. Ct. at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Therefore, "[w]hile there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the [conduct] 'beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

### A.

The district court correctly denied qualified immunity on Tobias's claim that the LAPD Detectives violated his Fifth Amendment right to counsel by continuing his custodial interrogation after he requested an attorney and then using the resulting confession against him in his criminal case. *See Davis v. United States*, 512 U.S. 452, 458–59 (1994); *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). If a suspect requests an attorney during a custodial interrogation, "he is not subject to further questioning until a lawyer has

been made available." *Davis*, 512 U.S. at 458. This request for counsel must be "unambiguous[]." *Id.* at 459. "Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* (internal citation and quotation marks omitted). Whether a suspect unambiguously requested an attorney is an objective question. *Id.*

Tobias's statement—"Could I have an attorney? Because that's not me"—was an unequivocal invocation of his right to counsel under clearly established law. *See Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999) (finding the request "[c]an I get an attorney right now, man?" was unequivocal); *United States v. de la Jara*, 973 F.2d 746, 750, 752 (9th Cir. 1992) (finding the request "[c]an I call my attorney?" was unequivocal). In *Smith v. Endell,* we concluded that the request "Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer" was "not [an] equivocal or ambiguous" request for an attorney. 860 F.2d 1528, 1529, 1531 (9th Cir. 1988). Tobias's initial question—"Could I have an attorney?"—differs from the initial question in *Smith* in only two respects: Tobias used the word "could" instead of "can," and he asked to "have" an attorney rather than to "talk" to one. This difference is immaterial. *See United States v. Lee*, 413 F.3d 622, 626 (7th Cir. 2005) (finding that "there is no real difference" between "Could I get a lawyer?" and "Can I have a lawyer?"). In modern usage, "Can I" and "Could I" are both well understood ways of asking a direct question—the only distinction is that "could" is considered a more polite form of request than "can." *See Merriam-Webster's Collegiate Dictionary* 284 (11th ed. 2005) (defining "could" as "a polite form" of

"can"); *see also New Oxford American Dictionary* 394 (Angus Stevenson & Christine A. Lindberg eds., 3d ed. 2010) (defining "could" as a word "used in making polite requests"). Similarly, asking to "have" an attorney is at least as direct as asking to "talk" to one. *See Smith*, 860 F.2d at 1531. The second half of Tobias's statement, "Because that's not me," does nothing to undermine his initial question, making his request, when taken as a whole, even *less* ambiguous than the conditional request found unambiguous in *Smith*. *See id*.

The LAPD detectives suggest that Tobias's question was not clearly established as unambiguous because we have found statements such as "I think I would like to talk to a lawyer," "Maybe he ought to see an attorney," and "[I] might want to talk to a lawyer," ambiguous. *See Clark v. Murphy*, 331 F.3d 1062, 1070–71 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003); *United States v. Doe*, 60 F.3d 544, 546 (9th Cir. 1995) (per curiam); *United States v. Fouche*, 776 F.2d 1398, 1405 (9th Cir. 1985), *overruled on other grounds by California v. Hodari D.*, 499 U.S. 621 (1991). But no one disputes that the police may continue questioning "when the suspect" expresses only that he "*might* want a lawyer." *Davis*, 512 U.S. at 462. In *Davis*, the Supreme Court found the use of "maybe" rendered a request for an attorney equivocal. *Id.*; *see also Doe*, 60 F.3d at 546 (relying on *Davis* to find a mother's statement that "'maybe [her minor child] ought to see an attorney' . . . was not clear and unambiguous"). Similarly, in *Clark*, a habeas appeal, we found that it was not "contrary to or an unreasonable application of clearly established federal law" for the Arizona Supreme Court to determine that "I think I would like to talk to a lawyer" was ambiguous, because "I think" is—like "maybe"—"equivocal to some degree." 331 F.3d at 1064, 1069–71. In *Fouche*, a pre-*Davis*

case, our decision also hinged on the "equivocal" nature of a request that used the term "might."   776 F.2d at 1405. Tobias, by contrast, "did not equivocate in his invocation by using words such as 'maybe' or 'might' or 'I think.'" *Anderson v. Terhune*, 516 F.3d 781, 788 (9th Cir. 2008) (citing *Arnold v. Runnels*, 421 F.3d 859, 865–66 (9th Cir. 2005)).   He asked directly for an attorney, a request the officers ignored.

 Because it was clearly established at the time of Tobias's interrogation that the statement "Could I have an attorney?   Because that's not me," was an unambiguous request for an attorney, [6] we affirm the district court's denial of qualified immunity on this claim.[7]

## B.

It was established at the time of Tobias's interrogation that "[a] coercive interrogation exists when the totality of the circumstances shows that the officer's tactics undermined the suspect's ability to exercise his free will," rendering his statements involuntary. *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003).   In determining whether a statement was involuntary, "[c]ourts . . . often consider the following factors: the youth of the accused, his intelligence,

---

 [6] The California Court of Appeal agreed that "'Could I have an attorney? Because that's not me,' was an unequivocal request for an attorney" under the circumstances. *Art T.*, 183 Cal. Rptr. 3d at 799.

 [7] The dissent suggests that because Officer Arteaga was not in the room when Tobias invoked his right to counsel, the claim should not proceed against him. Dissent at 29 n.1. The detectives did not raise this argument clearly and distinctly, and so we do not address it. *See, e.g.*, *McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th Cir. 2009) ("Because this argument was not raised clearly and distinctly in the opening brief, it has been waived.").

the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003). Any suggestion by a law enforcement officer "that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor" is unconstitutionally coercive. *United States v. Harrison*, 34 F.3d 886, 891–92 (9th Cir. 1994).

1.

In *Harrison*, we concluded that a *single* question during interrogation—asking if defendant Sonja Harrison "thought it would be better if the judge were told that she had cooperated or had not cooperated"?—was unconstitutionally coercive, rendering Harrison's subsequent confession involuntary. *Id.* at 890–92. The core of the "improper" and unduly coercive conduct in *Harrison* "was the suggestion that [agents] might inform the court that [Harrison] *had not cooperated*." *Id.* at 891 (emphasis added). The coercive impact of this threat was clear: "Harrison broke her silence only after the agent asked whether she thought it preferable if the judge were informed that she had cooperated or not cooperated. The first thing she said was that she thought it would be better if she talked to the agents and they informed the judge that she had cooperated." *Id.* at 892. Prior cases similarly highlighted the coerciveness of threatening a suspect for lack of cooperation. *See United States v. Leon Guerrero*, 847 F.2d 1363, 1366 n.2 (9th Cir. 1988) ("[T]hreatening to inform the prosecutor of a suspect's refusal to cooperate violates her fifth amendment right to remain silent."); *United States v. Tingle*, 658 F.2d 1332, 1336 n.5 (9th Cir. 1981) ("Although it is permissible for an

interrogating officer to represent, under some circumstances, that the fact that the defendant cooperates will be communicated to the proper authorities, the same cannot be said of a representation that a defendant's failure to cooperate will be communicated to a prosecutor.").

Threatening that a suspect will "receive less favorable treatment" for "exercis[ing] [his] rights" is so coercive that it always "risks overcoming the will of the run-of-the-mill suspect." *Harrison*, 34 F.3d at 891–92 (quoting *Collazo v. Estelle*, 940 F.2d 411, 426 (9th Cir. 1991) (Kozinski, J., concurring)). Accordingly, in *Harrison* we set down a bright-line rule: "there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor." *Id.* at 891–92 (citation omitted).[8] Under this clearly established law, Detective Arteaga violated Tobias's Fifth Amendment rights with his repeated assertions that the court would consider Tobias a "cold blooded killer" and "might throw the book at [him]" if he did not confess.

The LAPD detectives attempt to distinguish *Harrison* by arguing that Tobias was told he would be treated more

---

[8] The dissent argues that *Harrison* did not establish that such threats always render a suspect's subsequent statements involuntary. Dissent at 42–44. But this is exactly what it did. Indeed, in explaining why the police may never make such a statement, the *Harrison* court noted that "*[e]ven if Harrison were unusually resistant to psychological coercion*," the technique used was unacceptable because it would be coercive for the run-of-the-mill suspect. 34 F.3d 886 (emphasis added) (citation omitted); *see also Collazo*, 940 F.2d at 426 (Kozinski, J., concurring) ("[V]oluntariness is not merely a fact-bound question whether this particular suspect's confession is the product of coercion, but also a legal question about whether the techniques the police used were tolerable.").

harshly for affirmatively *lying* about his involvement in the murder rather than for failure to cooperate. But anyone in Tobias's shoes would have understood that Detective Arteaga considered anything less than a confession to the murder a "lie," because all of Tobias's attempts to deny the accusation were met with statements such as "you're full of shit" and "the bottom line, whatever you said, you were there." In other words, in the context of this particular interrogation, any threat that Tobias would be treated harshly for "lying" was no different than a threat that he would be treated harshly for refusing to cooperate by confessing— exactly the type of threat we have previously held to be categorically impermissible. *Harrison*, 34 F.3d at 891–92; *Leon Guerrero*, 847 F.2d at 1366 n.2; *Tingle*, 658 F.2d at 1336 n.5. The dissent similarly accuses us of ignoring the distinction between an officer suggesting silence would result in harsher treatment and that persisting in lying would do so. Dissent at 39–42. Even assuming the dissent is correct that the lynchpin of *Harrison* is literal silence rather than failure to cooperate, however, Detective Arteaga also directly commented on Tobias's silence—and thus his right to remain silent—when he told Tobias, "It's going to look like you're down—you're so down for the hood *that you didn't want to speak*. So they might throw the book at you." (emphasis added). This type of comment is clearly unconstitutionally coercive as established by *Harrison*.

The LAPD detectives also argue that *Harrison* involved a defendant "invoking the right to silence," whereas Tobias did not invoke that right. This argument lacks merit because the defendant in *Harrison* did not "invoke" her right to silence. *See* 34 F.3d at 890, 892. Rather, after Harrison was advised of her *Miranda* rights and acknowledged that she understood them, there was "a brief silence" where no one said anything, but then the agent resumed questioning,

including making the very statement that was unconstitutionally coercive. *Id.* at 890, 892.

What the detectives and dissent implicitly appear to be suggesting is that Tobias's case is distinguishable from *Harrison* because he *affirmatively denied* his guilt, rather than initially remaining silent. To accept this argument, we would have to conclude that it is *less* coercive to threaten a defendant for failing to cooperate when he has denied an allegation than when he has not yet been asked any questions or has simply stood silent when faced with accusations. This is not a tenable position, as Tobias's case illustrates. Tobias did not initially remain silent like the defendant in *Harrison*. Instead, he tried—desperately—to explain to the detectives that he had nothing to do with the murder. It was only after the detectives showed little interest in his explanation and repeatedly accused him of lying that Tobias concluded that he had no choice but to falsely confess, out of fear of the harsh treatment that Detective Arteaga threatened. If it is unconstitutionally coercive to threaten a defendant who has yet to say anything that harsh consequences could follow from a lack of cooperation, *see Harrison*, 34 F.3d. at 892, the same must clearly be true when a defendant *tries* to cooperate—as Tobias did here, by telling the truth—but the police continue to demand cooperation until the suspect confesses.

2.

Unlike Arteaga, who made the threats against Tobias, Detectives Cortina and Pere did not directly violate *Harrison* during Tobias's interrogation because they did not make threats of harsher punishment based on lack of cooperation. However, to the extent they were aware of the violation as it happened, they may have had a duty to intercede to stop the

constitutional violation and would not be entitled to qualified immunity.

By 2013, we had clearly established that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (quoting *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *aff'd in part, rev'd in part on other grounds*, 518 U.S. 81 (1996)). If an officer fails to intercede, "the constitutional right violated by the passive defendant is analytically the same as the right violated by the person who" performed the offending action. *Koon*, 34 F.3d at 1447 n.25. For example, "an officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest would, like his colleagues, be responsible for subjecting the victim to a deprivation of his Fourth Amendment rights." *Id.*; *see also Robins v. Meecham,* 60 F.3d 1436, 1442 (9th Cir. 1995) (holding that "a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene" when another official acts unconstitutionally). "[H]owever, officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Cunningham*, 229 F.3d at 1289; *see also Ramirez v. Butte-Silver Bow Cnty.*, 298 F.3d 1022, 1029–30 (9th Cir. 2002) (no violation of duty to intercede where there was no evidence that the defendant was aware of the constitutional violation as it occurred), *aff'd sub nom. Groh v. Ramirez,* 540 U.S. 551 (2004).

Tobias submitted evidence that there was a viewing room "just down the hallway" from the interrogation room, where officers could watch a video feed of the interrogation. Detective Pere also re-entered the interrogation room after

Tobias confessed, without being called in.  It is plausible that
Cortina and Pere watched Arteaga's questioning and were
aware of his violation of Tobias's Fifth Amendment rights
as it occurred.  Because neither side presented evidence as to
Cortina and Pere's involvement in this interrogation, we
remand for the district court to consider in the first instance
whether there are material facts in dispute as to Cortina and
Pere's liability for Arteaga's actions.[9]

C.

A person subjected to coercive interrogation techniques
can bring a substantive due process claim under the
Fourteenth Amendment.  *See Stoot v. City of Everett*,
582 F.3d 910, 928 (9th Cir. 2009); *see also Chavez v.
Martinez*, 538 U.S. 760, 774 (2003) (plurality opinion).  The
substantive due process standard requires showing that an
officer engaged in an "abuse of power [that] 'shocks the
conscience' and 'violates the decencies of civilized
conduct.'"  *Stoot*, 582 F.3d at 928 (quoting *Cnty. of
Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  The
Supreme Court has described "police torture or other abuse"
as the type of claim cognizable under the Fourteenth
Amendment.  *Chavez*, 538 U.S. at 773–74.  However,
"police conduct need not include physical violence to violate
substantive due process."  *Crowe v. Cnty. of San Diego*,
608 F.3d 406, 431 (9th Cir. 2010).  "*[P]sychological*
coercion is sufficient."  *Stoot*, 582 F.3d at 929.  "It has also
long been established that the constitutionality of

---

[9] We agree with the dissent that Tobias's interrogation was also
coercive under *Rodriguez v. McDonald*, 872 F.3d 908 (9th Cir. 2017).
However, as *Rodriguez* was not decided until after Tobias's
interrogation, it is irrelevant to the key question here: whether the LAPD
Officers are entitled to qualified immunity because they did not violate
clearly established law at the time of the incident.

interrogation techniques is judged by a higher standard when police interrogate a minor." *Crowe*, 608 F.3d at 431.

We have found psychologically coercive interrogation techniques "shock[ed] the conscience," *Stoot*, 582 F.3d at 928, in two cases with facts similar to this one. In *Crowe*, police interrogated three 14- and 15-year-old boys, Michael, Aaron, and Joshua, regarding the murder of Michael's sister. 608 F.3d at 418–26. The officers questioned Michael on four occasions, with at least one session lasting more than six hours. *Id.* at 418–23. After Michael repeatedly denied any involvement in the murder, officers falsely told him that they had found blood in his room and had lifted his fingerprints off the blood stains. *Id.* at 419. The officers tried various means to get Michael to confess, including—in what proved to be the "most 'effective'" tactic—saying that "he would get help rather than go to jail" if he confessed. *Id.* at 422. Eventually, Michael falsely confessed.[10] *Id.* In concluding that the officers' interrogation tactics "shock[ed] the conscience," we emphasized that the suspects were minors, and that the officers "isolated and subjected [the boys] to hours and hours of interrogation during which they were cajoled, threatened, lied to, and relentlessly pressured by teams of police officers." *Id.* at 432. This amounted to "[p]sychological torture." *Id.*

In *Cooper v. Dupnik*, we found a cognizable substantive due process violation where officers deliberately ignored an adult suspect's repeated invocations of his right to counsel, isolated him at the police station, and subjected him to "hours" of verbal interrogation where he was "hammered,

---

[10] The officers interrogated Joshua and Aaron using similar tactics for 13.5 and 9.5 hours in a single day, respectively, getting a false confession out of Joshua but not Aaron. *Crowe*, 608 F.3d at 423–25.

forced, pressured, emotionally worn down, stressed, and infused with a sense of helplessness and fear." 963 F.2d 1220, 1228–33, 1248–50 (9th Cir. 1992), *overruled on other grounds by Chavez*, 538 U.S. at 773. The officers intentionally tried to get a confession for the "purpose of making it difficult, if not impossible," for the defendant to "take the stand in his own defense" after he was charged, which we found to be a significant "aggravating circumstance." *Id.* at 1249.

The facts of Tobias's case share much in common with those in *Cooper* and *Crowe*. At 13, Tobias was even younger than the teens interrogated in *Crowe*. His direct request for an attorney was ignored. *See Cooper*, 963 F.2d at 1229. He asked for his mother and was assured that she would be right in, only to be confronted with another round of increasingly aggressive interrogation instead, leaving him "isolated from the outside world." *Id.* at 1225. For over an hour, Tobias was cursed at, called a liar, "emotionally worn down," "hammered" with questions, and "pressured" to confess to a crime he did not commit. *Id.* at 1248; *see also Crowe*, 608 F.3d at 432. The LAPD officers falsely insisted that they had strong evidence of guilt and promised leniency if Tobias confessed. *See Crowe*, 608 F.3d at 419–22. While Tobias was not in shock over a family member's death, Arteaga repeatedly invoked Tobias's family to emotionally manipulate him, saying that he was disgusted that Tobias was going to drag his mother into the proceedings by refusing to provide a confession. The interrogation left Tobias "infused with a sense of helplessness and fear," *Cooper*, 963 F.2d at 1248: when he spoke to his mother directly after the interview, she described him as "panicking," "crying," and "scared to shit."

This extended, overbearing interrogation of a minor, who was isolated from family and his requested attorney, comes close to the level of "psychological torture" that we have held is not tolerated by the Fourteenth Amendment. *Crowe*, 608 F.3d at 432. However, Tobias's interrogation falls short of the behavior in *Cooper* and *Crowe* in one main respect: unlike those cases, Tobias's mistreatment lasted under two hours.[11] We do not hold that "hours and hours," *Crowe*, 608 F.3d at 432, of coercive questioning are *required* for an interrogation to "shock[] the conscience," *Stoot*, 582 F.3d at 928. But because the prior cases in which we found "psychological torture" did involve hours of questioning, and because the officers' behavior towards Tobias was otherwise similar to—but not obviously worse than—the behavior in those cases, it was not clearly established that the offending tactics "shocked the conscience" when used over a shorter period of time. Because controlling precedent does not establish "beyond debate" that the officers' conduct violated the Fourteenth Amendment, they are entitled to qualified immunity on this claim. *al-Kidd*, 563 U.S. at 741.

## IV.

We **AFFIRM** the district court's denial of qualified immunity on Tobias's *Miranda* claim, and as to Detective Arteaga on Tobias's coercive interrogation claim. We **REVERSE** the denial of qualified immunity for all three officers for Tobias's Fourteenth Amendment claim. We

---

[11] There is also no evidence that the officers here intentionally conspired to deprive Tobias of his right to take the stand, as the officers did in *Cooper*. 963 F.2d at 1249. However, that factor was also not present in *Crowe*, and is not a requirement for finding interrogation tactics that violate the Fourteen Amendment. *See* 608 F.3d at 431–33.

**REMAND** for further proceedings consistent with this opinion.

---

COLLINS, Circuit Judge, concurring in part, concurring in the judgment in part, and dissenting in part:

Although 13-year-old Art Tobias had participated in the murder of Edwin Cruz on the evening of August 17, 2012—for which he pleaded guilty, as a juvenile, to involuntary manslaughter—he had no role at all in the murder of Alex Castaneda a few hours later in a different part of Los Angeles.  But after several people tentatively identified Tobias from surveillance video as one of Castaneda's assailants, detectives from the Los Angeles Police Department ("LAPD") conducted a 90-minute interrogation of Tobias on August 20, 2012 with respect to the Castaneda murder.  The interrogation was unlawful in two respects.  First, the officers disregarded Tobias's explicit request for an attorney, in clear violation of *Edwards v. Arizona*, 451 U.S. 477 (1981).  Second, the methods used during the officers' questioning were impermissibly coercive under the standards set forth in *Rodriguez v. McDonald*, 872 F.3d 908 (9th Cir. 2017).  As a result of this improper interrogation, Tobias provided a detailed confession to the Castaneda murder, using (as it turned out) many of the details of the Cruz murder.  Based on this confession, Tobias was tried as a juvenile and found guilty of the Castaneda murder, but the California Court of Appeal reversed due to the *Edwards* violation.  *See In re Art T.*, 183 Cal. Rtpr. 3d 784 (Cal. Ct. App. 2015).

Tobias subsequently filed this § 1983 action against several of the officers involved in the investigation of the Castaneda murder.  The only claims at issue in this appeal

are Tobias's federal constitutional claims concerning the conduct of the interrogation itself.  The district court denied qualified immunity to the four officers named in these claims, and those officers have appealed that denial to this court.  I agree with the majority that the relevant officers involved in the interrogation were not entitled to qualified immunity with respect to Tobias's Fifth Amendment right to counsel claim, and I therefore concur to that extent in Part III(A).[1]  I also agree with the majority's ultimate conclusion to reverse the district court's denial of qualified immunity with respect to Tobias's Fourteenth Amendment due process claim, but my reasoning differs somewhat from the majority's and so I concur only in the judgment as to Part III(C).  I also agree with the majority that the officers are entitled to summary judgment on Tobias's fabrication-of-evidence claim under *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc), to the extent that that claim is based on the allegedly coerced confession.  *See* Maj. Opin. at 7 n.1.[2]  Lastly, because *Rodriguez* was decided nearly five years after the interrogation in this case, and because no

---

[1] Only Detectives Cortina and Pere were present when the *Edwards* violation occurred.  Detective Arteaga specifically testified that he was unaware of Tobias's invocation of his right to counsel, and Tobias presented no contrary evidence in opposing summary judgment.  Accordingly, to the extent that this claim is cognizable in a § 1983 action, I would allow this claim to go forward only against Detectives Cortina and Pere.  Contrary to the majority's assertion, *see* Maj. Opin. at 18 n.7, this issue was not forfeited.  The detectives' joint brief specifically identifies which detectives were involved in which aspects of the interrogation, and with respect to Tobias's invocation of his right to counsel, the brief states that "[n]otably, only Detectives Pere and Cortina were present and heard Tobias' statement."  I therefore do not join footnote 7 of Part III(A).

[2] This is the only claim before us in which Detective Motto is a defendant.

other then-existing precedent clearly established that the officers' combination of tactics would be deemed coercive, I would reverse the district court's denial of qualified immunity with respect to Tobias's coerced confession claim. I therefore dissent from the majority's opinion as to Part III(B).

# I

LAPD Detectives Julian Pere and John Motto learned shortly after midnight on August 18, 2012 that a purported gang-related shooting had just taken place, in which one victim—Alex Castaneda—was killed and two victims were critically injured. During the initial investigation that night, the detectives learned that there were two assailants, one of whom was captured on a nearby building's security footage. After reviewing this footage sometime before 2:00 AM, a local gang enforcement officer, Marshall Cooley, concluded that the shooter appeared to be Tobias. Cooley's identification was based on his having just reviewed photos of Tobias hours earlier when, at around 9:00 PM on August 17, Tobias's mother, Helen Contreras, had come to the police station to report that Tobias was missing. Contreras expressed concern that her son was involved with the MS-13 gang, and she showed Cooley a Facebook post in which Tobias had stated, "I'm going to go on the most important mission of my life, don't know if I'm going to come back alive or dead or arrested." After reviewing the surveillance video, Cooley summoned another gang enforcement officer, Dora Born, to the scene and, without telling her his views about the suspect's identity, asked her to review that video. Born promptly identified the suspect as Tobias, whom she knew to be an MS-13 gang member who went by the moniker of "Casper."

On August 20, 2012, Detective Motto and Detective Michael Arteaga went to Berendo Middle School, where Tobias was a student. They first showed the security footage to an on-site Los Angeles Unified School District officer, Daniel East. East had some difficulty identifying the suspect, but after reviewing the video several times, he stated that he thought the shooter resembled Tobias, although he noted that the suspect appeared larger in the video than Tobias did in person. The detectives thereafter separately showed the video to a dean of the middle school, Roger Negroe, but he was unable to identify the suspect. However, after walking with East and the detectives to the front of the school, Negroe happened to see someone whom he thought looked like the suspect in the video, and he notified the detectives. That person was Tobias, and the detectives took him into custody.

At the police station, Tobias was initially questioned by Detectives Pere and Jeff Cortina. After starting with several background questions, the detectives began asking Tobias whether he was affiliated with a gang. Tobias admitted that his previous school "had [him] on gang file" for MS-13 and that his gang nickname was "Casper," but he explained that he was not actually in the gang and instead was "future." The detectives then asked Tobias a series of questions to determine whether he was sufficiently mature to differentiate right from wrong, pursuant to *In re Gladys R.*, 464 P.2d 127 (Cal. 1970). After these questions, roughly 20 minutes into the interrogation, Detective Cortina read Tobias his *Miranda* rights. Tobias stated that he understood his rights.

The detectives showed Tobias the security camera video of the shooter. Tobias asked, "Who is that?" Detective Pere responded, "That, my friend, would be you." Tobias

repeatedly denied that he was the person in the video.  When the officers told him that the shooting had taken place on Alvarado Terrace near downtown Los Angeles, Tobias explained that he had been miles away in Arcadia that night with a friend and had been dropped off at his home before midnight by his friend's mother.  But the detectives persisted in accusing Tobias of the shooting, falsely telling him: "somebody gave you up."  The following exchange then ensued:

> Det. Pere:  Okay.  Well, I—you know what? We're here to speak to you to get your statement.  Now, if your statement is that that's not you, don't worry.  We're going to write it down just the way you said.  That's not—
>
> Tobias:  Could I have an attorney?  Because that's not me.
>
> Det. Pere:  But—okay.  No, don't worry. You'll have the opportunity.

Detective Cortina quickly jumped in with another question, and the interrogation continued with no further acknowledgement of Tobias's request for an attorney.

Tobias continued to deny that he was the shooter in the video.  About 35 minutes into the interview, Detective Pere told Tobias:  "[R]ight now, man, you're looking at murder. Looks like you're going to get booked today for murder, so I hope you don't have that claustrophobia like we were talking about."  Detectives Pere and Cortina then left the room, telling Tobias his mother would be in to talk to him shortly.

Instead of Tobias's mother, Detective Arteaga came in two minutes later.  Detective Arteaga had just finished meeting with Tobias's mother, Ms. Contreras, in another room.  Detective Arteaga had shown her a screenshot from the security footage and asked, "that's your son right there, right?"  She had replied, "Yes."  This identification was made before Contreras was aware that the screenshot was related to the investigation of a shooting.  After she was made aware of the context, she recanted her identification.

Once in the interrogation room, Detective Arteaga pulled his chair close to Tobias and began questioning him in a more aggressive tone than Detectives Cortina and Pere had been using.  Over the course of roughly half an hour, Detective Arteaga repeatedly told Tobias that he would look like a "cold-blooded killer" if he continued to lie, that it was "f—ed up" that he was going to force his mother to have to testify in court to identify him as the person on the video, and (falsely) that the police already knew that Tobias had committed the murder because somebody had given him up.  Detective Arteaga also told Tobias several times that he might receive leniency from the judge if he admitted the truth.  After a long exchange in which Detective Arteaga continued to emphasize that a judge would likely look favorably upon Tobias admitting his guilt, Tobias confessed to the shooting.  Tobias said that he had gone to the location in a car with a 19-year-old nicknamed "Diablo," whose girlfriend was driving, and that Diablo's newborn baby daughter was in the backseat.  Tobias said that he and Diablo got out of the car, that Diablo gave him a gun, and that Diablo also had a similar gun.  Tobias stated that, although they both fired their guns, Tobias was the first one to shoot.

A juvenile delinquency petition was thereafter filed against Tobias under California Welfare and Institutions

Code § 602, alleging, *inter alia*, that he had murdered Castaneda. *In re Art T.*, 183 Cal. Rptr. 3d at 789. The trial court denied Tobias's motion to suppress his confession and held a three-day hearing on the charges in the petition. *Id*. at 790. As the trial court noted after the close of the evidence, "no witness" at the hearing "identified Art from the video," and the court also stated that the "quality of the video" was insufficient to determine whether the assailant was Tobias. *Id*. at 793. Nonetheless, based largely on the confession, the trial court found that the charges had been proved beyond a reasonable doubt. *Id*. On appeal, however, the California Court of Appeal reversed. *Id*. at 801. The court held that Tobias "unequivocally requested an attorney prior to his confession and that once he made this request, all questioning should have stopped." *Id*. at 793. Accordingly, the court held that all of Tobias's statements to the officers "should have been suppressed." *Id*. at 800. All parties now agree that Tobias had no involvement in the Castaneda murder.

Thereafter, Tobias was the subject of a separate juvenile proceeding in connection with the Cruz murder, and he pleaded guilty to a charge of involuntary manslaughter. In describing the events leading up to Cruz's murder, Tobias stated that Diablo's girlfriend had driven Diablo, their infant daughter, Tobias, and one other person to the scene of that shooting, but Tobias said that Diablo was the sole shooter.

## II

In my view, the district court erred in denying qualified immunity with respect to Tobias's claims that the detectives obtained and used an involuntary confession in violation of his Fifth Amendment right against self-incrimination.

## A

Considered under current law, the overall circumstances of Tobias's interrogation would now be deemed to be impermissibly coercive. Specifically, in our 2017 decision in *Rodriguez*, we held that an interrogation presenting many of the same key features as this one ultimately produced a confession that "was not voluntary." 872 F.3d at 923. We noted that Rodriguez was only 14 years old at the time of his interrogation and had a "borderline" IQ, *id*. at 912, 923; that the officers had ignored his request for counsel, *id*. at 924; that the officers falsely told Rodriguez that others had implicated him, *id*. at 914, 924 n.3; and that, when Rodriguez "answered in a way that conflicted with the officers' narrative, they accused [him] of lying and told him that 'nobody likes a liar, man, the judges [don't] like liars, the probation department doesn't like liars, police don't like the liars," *id*. at 912, 923–24 & n.3 (second alteration in original). Given that Tobias's interrogation, taken as a whole, presents essentially the same key features that we emphasized in *Rodriguez*, the obtaining of his confession and its subsequent use at his juvenile proceedings violated his Fifth Amendment right against compelled self-incrimination.

But to defeat qualified immunity, it is not sufficient to show that the plaintiff's rights were violated. Rather, the plaintiff must make the additional further showing "that the official violated a statutory or constitutional right that was *clearly established* at the time of the challenged conduct." *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) (simplified) (emphasis added). "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that *any* reasonable official in the defendant's shoes would have understood that he was

violating it." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (emphasis added) (citations and internal quotation marks omitted). Tobias failed to meet this demanding standard. *See Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.").

Although Detectives Pere and Cortina committed a clear-cut *Miranda/Edwards* violation, *see* Maj. Opin. at 15–18, that fact alone is not sufficient to establish that the resulting confession was involuntary. *Bradford v. Davis*, 923 F.3d 599, 616 (9th Cir. 2019) ("[S]tatements taken in violation of *Edwards* . . . are not presumed to be involuntary by virtue of the *Edwards* violation alone."). Considered against the then-controlling precedent that has found coercion in custodial interrogation, the objective circumstances of Tobias's interrogation, viewed in the light most favorable to him, were not such that any reasonable police officer would have realized that the Fifth Amendment right against compelled self-incrimination was being violated.

Although Tobias was only 13 years old and his unequivocal request for counsel was improperly brushed aside, his early-evening interrogation lasted only approximately 90 minutes, involved no physical threats or abuse, and otherwise relied on interrogation techniques that cannot be said, either singly or in the combination presented here, to have violated then-clearly-established law (*e.g.*, bluffing about the strength of the evidence the officers had, arguing that the courts would go easier on the suspect if he did not lie and instead told the truth about what he had done, and shaming the suspect for the effect a prosecution would

have on his family).[3] Despite the violation of Tobias's right to counsel, in my view Tobias has failed to show that, even considered as a whole, the detectives' conduct in the interrogation constituted impermissible coercion under clearly established law as it stood in 2012.

Like the Fourth Amendment prohibition of excessive force, the Fifth Amendment protection against the use of involuntary statements at a criminal trial is one that involves "an area of the law 'in which the result depends very much on the facts of each case.'" *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (citation omitted). Courts employ "no 'talismanic definition' of voluntariness," but instead consider the "totality of the circumstances" of the interrogation. *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003) (citation omitted); *see also id*. ("Courts . . . often consider the following factors: the youth of the accused, his intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep."). Consequently, "'[s]pecificity'" is important here, because "'it is sometimes difficult for an officer to

---

[3] In seeking rehearing, Tobias and *amicus curiae* suggest that the coercive nature of the officers' tactics is confirmed by the fact that Tobias "falsely confessed *to the facts the detective fed him*." Pet. for Reh'g En Banc at 6 (emphasis added); *see also* Br. for Amicus Curiae The Center on Wrongful Convictions of Youth at 16–17. The record does not support that assertion. In fact, as noted earlier, the key details that Tobias supplied in his false confession to the Castaneda murder at issue here (such as the identity of the shooter and the number and descriptions of the other persons present with Tobias in the car) were *not* supplied by the officers but instead correspond to the circumstances of the separate Cruz murder in which Tobias was concededly involved only a few hours earlier.

determine how the relevant legal doctrine'"—here, the law against coerced confession—"'will apply to the factual situation the officer confronts.'" *Kisela*, 138 S. Ct. at 1152 (citation omitted). As a result, a plaintiff seeking to defeat qualified immunity must establish that "'*any* reasonable official in the defendant[s'] shoes would have understood'" that the *particular* circumstances of the specific interrogation were impermissibly coercive under the then-existing case law. *Id*. at 1153 (emphasis added) (citation omitted); *see also Hunter v. Bryant*, 502 U.S. 224, 229 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." (simplified)).

Here, the particular circumstances of the interrogation do not present the same sort of confluence of features that, as of 2012, we had previously held to be coercive. *Cf.*, *e.g.*, *Taylor v. Maddox*, 366 F.3d 992, 1012, 1015–16 (9th Cir. 2004) (confession was clearly involuntary where 16-year-old suspect was arrested late at night, questioned until 3:00 AM, threatened with a jab to the face, and had his repeated requests for counsel denied), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014); *Gladden v. Holland*, 366 F.2d 580, 582 (9th Cir. 1966) (finding coercion where officers ignored a request for counsel, conducted the interrogation "throughout the night," and called in alleged rape victims to view the suspect). On the contrary, they appear to be *less* coercive than other pre-2012 cases in which we found that coercion had *not* been established. *See*, *e.g.*, *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003) (finding no coercion where interrogation went for eight hours without a break, officers continued to question the suspect after claims of

innocence, and officers played on the suspect's fear of prison).

## B

The majority nonetheless concludes that Detective Arteaga violated clearly established law, based on its conclusion that we had held, in *United States v. Harrison*, 34 F.3d 886 (9th Cir. 1994), that "[a]ny suggestion by a law enforcement officer 'that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor' is unconstitutionally coercive." *See* Maj. Opin. at 19.  That is wrong, because the rule that the majority purports to extract from *Harrison* involves two significant innovations that post-date the 2012 interrogation of Tobias.

First, the majority ignores the distinction between suggesting that *silence* would result in harsher treatment and suggesting that *persisting in lying* would do so.  *Harrison* held that "there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the *right to remain silent* may result in harsher treatment by a court or prosecutor."  34 F.3d at 891–92 (second emphasis added).  In *Harrison*, the agents advised the defendant of her *Miranda* rights and then, before she said anything, "asked her whether she thought it would be better if the judge were told that she had cooperated or had not cooperated."  *Id*. at 890.  We held that "the suggestion that they might inform the court that she had not cooperated" was "improper conduct."  *Id*. at 891.  We reasoned that "'a defendant may not be made to suffer for his [or her] silence,'" *id*. (emphasis added) (quoting *United States v. Tingle*, 658 F.2d 1332, 1336 n.5 (9th Cir. 1981)), and that therefore "there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the *right to remain silent* may result in harsher treatment

by a court or prosecutor," *id*. at 891–92 (second emphasis added); *see also Collazo v. Estelle*, 940 F.2d 411, 414, 417 (9th Cir. 1991) (en banc) (where suspect, at the outset of the police interrogation, refused to talk and asked for a lawyer, the officers' threat that "it might be worse" for him if he did not talk was an impermissible "attempt in the police station to impose a penalty on Collazo's choice to remain silent"). Given that Tobias never chose to be *silent*, Detective Arteaga here never "commented on Tobias's silence," *see* Maj. Opin. at 21–22, and Detective Arteaga did not threaten Tobias that, had he stayed silent, that would have led to harsher treatment. Instead, Detective Arteaga told Tobias that he thought the affirmative story Tobias was telling was a lie and that Tobias's persistence in lying would make him look like a "cold-blooded" killer, resulting in harsher treatment from the prosecutor and the courts.[4] Given this crucial distinction

---

[4] For example, Detective Arteaga told Tobias that, when the case was presented to the district attorney's office, they were "going to see that you're a gangster who lies." In another lengthy speech to Tobias, Detective Arteaga stated: "[W]hen we take the case to court they're going to think you're a big time gang killer who didn't want to tell the truth who is down for the hood. It's going to look like you're down— you're so down for the hood that you didn't want to speak so they might throw the book at you. But when you're honest and you tell the truth it's going to help you out in the long run. I'm telling you that right now, they're going to have some compassion for you. But they do not like gang murders where people lie, deny it." Detective Arteaga later similarly told Tobias that there are cases "where guys have told the truth, they've been honest, and they get a much reduced sentence," and that, "I'm telling you this, [the judge is] going to look at you a lot more—with a lot more compassion if you told the truth [about] what happened." The majority misleadingly cites, out of context, Detective Arteaga's use of the above-quoted phrase "you didn't want to speak" as if it were a comment on an invocation of the right to remain silent. *See* Maj. Opin. at 21. But as the more complete quotation provided above makes clear, the entire speech can only be understood as referring to Detective Arteaga's belief that Tobias was continuing to lie. Indeed, the majority's

between *Harrison* and this case, it cannot be said that every reasonable officer would have understood in 2012 that such comments would have violated the principles established in *Harrison*.

To be sure, the distinction just noted was effectively eliminated by our decision in *Rodriguez*, in which we applied the reasoning of *Collazo* in a factual context that was, in all relevant respects, materially similar to the one presented here. Although we did not cite *Harrison* in *Rodriguez*, we cited *Collazo* and made clear that the same principles discussed in that case (and in *Harrison*) apply in the context of an officer's threat that, if the suspect persisted in lying, that might result in harsher treatment from the prosecutor or the court. 872 F.3d at 924. The problem is that *Rodriguez* was decided five years *after* the interrogation in this case, and the majority points to no then-existing precedent that extended the principles of *Collazo* and *Harrison* to the persistence-in-lying context.[5] But as the

---

notion that this was somehow a comment on Tobias's supposed "silence" is refuted by the fact that Tobias never invoked his right to silence (as opposed to his right to counsel) and by the fact that he had been speaking with the detectives for nearly an hour by that point.

[5] The two cases cited by the majority do not support its conclusion. *Tingle* did not involve a suspect who had remained silent, and we went on to hold that the "record simply does *not* support Tingle's claim that [the officer] made any improper promise or agreed to seek her early release" if she cooperated. 658 F.2d at 1335 (emphasis added). We instead concluded that Tingle's confession was involuntary due to the officer's effort "to cause Tingle to fear that, if she failed to cooperate, *she would not see her young child for a long time*." *Id*. at 1336 (emphasis added). In a footnote, we noted in dicta that we "disapprove[d]" making "statement[s] that *failure to cooperate* will be reported." *Id*. at 1336 n.5 (emphasis added). That statement, by its terms, says nothing about whether officers may admonish suspects that persistence in *lying* would

Supreme Court has admonished, the qualified-immunity analysis is limited to "'existing precedent'" because future decisions cannot give "'fair notice'" to government officials. *Kisela*, 138 S. Ct. at 1153–54 (citations omitted); *see also id*. at 1154 (admonishing this court for relying on a case "that postdated the shooting at issue" and "was therefore 'of no use in the clearly established inquiry'" (citation omitted)). For the same reasons, the majority's argument today for *extending* the principles of *Harrison* to the different context presented here, *see* Maj. Opin. at 20–22, is of no value in determining what was clearly established law in 2012. Because it would not have been clear to every reasonable officer in 2012 that a suspect could not be warned that continuing to lie during an interrogation could lead to harsher consequences, Detective Arteaga did not violate clearly established law and is entitled to qualified immunity.[6]

Second, in addition to extending the *Harrison* rule to a context in which it had not been applied pre-2012, the majority radically transforms that rule in a further respect that is unsupported by precedent. According to the majority,

---

not be viewed favorably. And in *United States v. Guerrero*, 847 F.2d 1363 (9th Cir. 1988), we found the confession there to have been *voluntarily* given, and we distinguished *Tingle* on its facts. *Id*. at 1366–67 & n.2.

[6] Indeed, it is ironic that, even after *Rodriguez*, this court itself distinguished *Harrison* on precisely the ground that, unlike in *Harrison*, the officer there "was merely warning [the suspect], *who was already talking with him*, that if he was *not honest* in his statements to police, it could make the situation he was in worse." *United States v. Cragg*, 807 F. App'x 640, 643 (9th Cir. 2020) (emphasis added). If we are still making this distinction three years after *Rodriguez*, we cannot expect officers to have foreseen in 2012 that *Rodriguez* would effectively eliminate that distinction in 2017.

a violation of its broader *Harrison* rule is now *per se* "unconstitutionally coercive." *See* Maj. Opin. at 19. This principle was *not* clearly established law in 2012; indeed, it was not the law at all until the majority announced this novel rule in its decision today. *Harrison* itself nowhere adopts the majority's per se rule requiring an automatic finding of involuntariness. On the contrary, it reiterated that the voluntariness inquiry turns on "the totality of the circumstances" and requires a court to consider whether "'the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne.'" 34 F.3d at 890 (citation omitted). The majority points to *Harrison*'s statement that "'there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor.'" *See* Maj. Opin. at 20 (quoting 34 F.3d at 891–92). But the majority ignores the very next sentence of *Harrison*, which confirms that the court there was not creating a per se rule about *voluntariness*: "'The admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne.'" *See Harrison*, 34 F.3d at 892 (quoting *Miller v. Fenton*, 474 U.S. 104, 116 (1985)) (alteration omitted). *Harrison* thus may have established a per se *prophylactic* rule about how officers should behave in an interrogation,[7] but *Harrison* made clear that voluntariness

---

[7] The additional language that the majority quotes from *Harrison* only serves to confirm this point. As the majority notes, *see* Maj. Opin. at 20 n.8, *Harrison* suggested that the technique used there was unacceptable because it "*risks* overcoming the will of the run-of-the-mill

still had to be considered in light of all of the circumstances, and we proceeded to do just that in evaluating the voluntariness of Harrison's confession.[8]    *Id*. at 892 (considering, in addition to the improper statement to Harrison, the fact that "fifteen armed federal agents had just searched the house, arrested her, and taken her companion away to jail").  The majority's clear misreading of *Harrison* as establishing an automatic rule of *involuntariness* was not the law in this circuit until the majority announced it today, and it certainly was not clearly established law in 2012.

## III

I agree with the majority's decision to reverse the district court's denial of qualified immunity with respect to Tobias's substantive due process claim under the Fourteenth Amendment, but I reach that conclusion for somewhat different reasons than the majority.

Although this claim (unlike the Fifth Amendment claim) does not require a showing that the confession was used

---

suspect.'" 34 F.3d at 892 (emphasis added) (citation omitted).  That is the language of a prophylactic rule and not of conclusively-presumed involuntariness.

[8] Although the operative complaint's Fifth Amendment claim contains separate paragraphs alleging both that the confession was involuntary and that the confession was unlawfully obtained in violation of *Edwards*' prophylactic per se rule, it does not contain a comparable specific allegation that the confession was obtained in violation of a per se prophylactic rule of the sort suggested by *Harrison*.  Rather, the complaint only mentions the threats of harsher treatment as a factor weighing in favor of *involuntariness*.  Accordingly, we do not have a separate *Harrison*-based prophylactic-rule claim before us, and I therefore have no occasion to address whether such a claim would be cognizable under § 1983.

against Tobias, "[t]he standard . . . is quite demanding," requiring something akin to "'police torture or other abuse'" or comparable conduct that "'shocks the conscience.'" *Stoot v. City of Everett*, 582 F.3d 910, 928 (9th Cir. 2009) (citations omitted).   In contending that the detectives violated clearly established law in this regard, Tobias relies on *Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir. 2010), and *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992), but the facts of both cases are materially different from those presented here.

In *Crowe*, police interrogated three 14- and 15-year-old boys, Michael, Aaron, and Joshua, regarding the murder of Michael's sister, Stephanie.   608 F.3d at 417.   During the third of Michael's four interrogations, at least one of which lasted six hours, Michael consented to a "truth verification exam," after which an officer told him that some of his answers indicated "some deception." *Id*. at 419.   The officer then asked, "Is there something, though, that maybe you're blocking out . . . in your subconscious mind that we need to be aware of?" *Id*.   After Michael denied this claim, another officer "told Michael they found blood in his room, lifted fingerprints off the blood stains, and that the police now knew who killed" his sister, and asked Michael "what [he] did with the knife." *Id*.   The officer urged Michael to do "the right thing by Stephanie's name and . . . by your parents," before he suggested the idea that Michael "killed Stephanie but did not remember it," given that the officers were "[a]bsolutely" "sure about the evidence."   *Id*. at 419–20. Other tactics included telling Michael that there were "two Michaels" and that "the good part of Michael didn't do it," and telling Michael that if he confessed, as opposed to "ma[king] the system prove" the murder, "he would get help rather than go to jail." *Id*. at 421–22.   Michael then made up a story of how he committed the murder, explicitly and

repeatedly stating—as he was telling it—that the story was a "complete lie" that he was providing to avoid jail based on the officers' advice. *Id*. at 422.

The officers also interrogated Joshua and Aaron using similar tactics, getting a false confession out of Joshua but not Aaron. 608 F.3d at 423–25. Joshua was interrogated for 12 hours on one occasion and 13½ hours in a second session weeks later, and Aaron was interrogated for 9½ hours on one occasion. *Id*. We noted that, at around "3:00 a.m.," one of the officers used "the computer stress voice analyzer" on Joshua, "describing the device to Joshua in the same way as he had to Michael and Aaron." *Id*. at 424. Moreover, the officer continued Joshua's interrogation "for several hours and he repeatedly denied Joshua's requests for sleep." *Id*. at 424–25.

We concluded in *Crowe* that these interrogation tactics "shock[ed] the conscience," emphasizing that the children were minors, that one of the suspects was deeply distraught over his sister's murder, that the interrogations involved significant psychological manipulation, and that the interrogations lasted for "hours and hours." *Id*. at 532.

Given that the circumstances of the interrogations in *Crowe* were so much worse than those in this case, *Crowe* cannot be said to have made clear to every reasonable officer that the methods used in interrogating Tobias violated his substantive due process rights. As the majority notes, the interrogations of all of the suspects in *Crowe* lasted for many hours, whereas Tobias's interrogation (including the initial preliminary questions) lasted only about 90 minutes. But the differences go well beyond that. The questioning of each of the boys involved the psychologically manipulative use of a "computer stress voice analyzer," and Joshua's interrogation involved deliberate sleep deprivation. The detectives'

behavior in this case simply does not compare to the "[p]sychological torture" that the officers in *Crowe* inflicted upon the suspects in that case. 608 F.3d at 432.

*Cooper* is even further afield. There, police officers— who were "quite candid" about the intent of their scheme— meticulously "developed a strategy for interrogating" an adult defendant, which involved "cut[ting] [him] off from the rest of the world," "creating [a] sense of hopelessness," making him "emotionally worn down," and *intentionally* "not honor[ing] an assertion of counsel or silence." 963 F.2d at 1223–25 (emphasis omitted). The officers' plan was to "prevent the defendant from testifying at his own trial" by obtaining material for impeachment during the interrogation. *Id*. The officers "knew their plan patently was unconstitutional." *Id*. at 1225. Executing their plan, the officers deliberately ignored the defendant's repeated invocations of his right to counsel. *Id*. at 1129–31. Although Detectives Pere and Cortina also ignored Tobias's single invocation of the right to counsel, there is no evidence that they went into the interrogation with a plan to do so, not to mention a "purpose of making it difficult, if not impossible, for [Tobias] to take the stand in his own defense" through methods that are "deliberately unlawful and flout the Constitution." *Id*. at 1249–50.

Because controlling precedent does not establish "beyond debate" that the detectives' conduct here shocks the conscience, *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), the detectives are entitled to qualified immunity on this claim. I therefore concur in the majority's judgment reversing the denial of summary judgment as to this claim.

\*　　\*　　\*

For the foregoing reasons, I concur in part, concur in the judgment in part, and respectfully dissent in part.